*Decision will be entered under Rule 50.*

SAMUEL TOWERS, ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28753; 28754, 28778, 28779, 28816.    Filed May 18, 1955.

---

*Albert Averbach, Esq.*, for the petitioners.
*Thomas R. Charshee, Esq.*, for the respondent.

FISHER, *Judge:* The respondent determined deficiencies in the Federal income taxes of petitioners as follows:

| Petitioner | 1944 | 1945 | 1946 | 1947 |
|---|---|---|---|---|
| Samuel Towers | | $1,297.04 | $1,098.10 | $356.20 |
| Albert Towers | $3,670.92 | 23,590.05 | 6,326.52 | 199.74 |
| Theodore C. Bonney | 6,608.63 | 16,129.99 | 5,607.44 | 3,036.44 |
| Albert Averbach | 1,136.27 | 13,707.03 | 1,104.83 | 1,652.87 |
| David M. Hayman | 696.98 | 15,328.05 | 431.39 | |

The issues presented for our consideration are:

(1) Whether certain unpaid loans made by several of petitioners in 1947 to Rumsey Products, Inc., with which they were variously associated as stockholders, employees, officers, and directors were business bad debts arising from a business of promoting, organizing, managing, and financing business enterprises, or were nonbusiness bad debts.

(2) Whether losses sustained by several of the petitioners from advances to a so-called "motor pool" organized to finance motor purchases of Rumsey Products, Inc., were losses incurred in a trade or business, or a transaction entered into for profit, under section 23 (e) of the 1939 Code, or were business bad debts under section 23 (k) (1) or nonbusiness bad debts under section 23 (k) (4).

(3) Whether losses sustained by several of the petitioners, when as a consequence of involuntary bankruptcy proceedings Rumsey Products, Inc., failed to deliver certain finished lawn mowers purchased by these petitioners for resale, were incurred in a trade or business or a transaction entered into for profit under section 23 (e) (1) or (2), or were nonbusiness bad debts.

(4) Whether a distribution in 1945 by Rumsey Manufacturing Co., the stock of which was owned by several of petitioners, represented a distribution of profits or the repayment of the proceeds of certain claims, and if the latter, (a) whether petitioners have established a basis for said claims, and (b) whether or not the proceeds are to be treated as capital gains.

(5) Whether a cash distribution made by Rumsey Manufacturing Co. in 1945 in connection with the retirement of its preferred stock

was made in partial liquidation or was a distribution essentially equivalent to a taxable dividend.

(6) Whether a distribution made by Rumsey Manufacturing Co. in 1945 in satisfaction of certain claims against the company, previously purchased by several of petitioners, was taxable in full as ordinary income.

(7) Whether certain amounts, or any part thereof, paid by petitioner Albert Towers in discharge of his liability as endorser of certain notes are to be treated as business losses, losses incurred in transactions entered into for profit, business bad debts, or nonbusiness bad debts.

(8) Whether or not certain expenses, or any part thereof, incurred by several of petitioners in an unsuccessful attempt to reorganize Rumsey Products, Inc., in connection with proceedings in bankruptcy in 1947, are deductible as either business losses or business bad debts.

(9) Whether petitioners are entitled to net operating loss carrybacks from 1947 to 1945 and 1946.

(10) Whether the amount realized by petitioner Theodore C. Bonney on the sale of a note given petitioner by Rumsey Manufacturing Co. for accrued salary and director's fees is to be treated as capital gain or ordinary income.

(11) Whether petitioner Theodore C. Bonney realized additional income in 1946 and 1947, based on the fair rental value of certain premises owned by Rumsey Manufacturing Co. and occupied by Bonney who was an officer, director, and stockholder of Rumsey Mfg.

(12) To what extent, if any, petitioner Bonney suffered a casualty loss, within the meaning of section 23 (e) (3), as a result of amounts spent for repairs for storm damage to the premises rented by Bonney from Rumsey Mfg. when Bonney was under no obligation to make any such repairs.

(13) Whether, in the particular circumstances of this case, monies which petitioner Bonney gave to Edna for clothing and spending money during the period that they lived together as man and wife may be deducted as a loss from theft under section 23 (e) (3), when their marriage was, in fact, a nullity and was allegedly induced by fraudulent misrepresentation.

(14) Whether certain monies and property which Bonney transferred to Edna to deter her from further spreading allegedly false and malicious statements concerning Bonney's personal character and professional and business integrity are deductible either as theft losses or business expenses.

Of the remaining issues raised in the petitions, some have been settled by stipulation of the parties. Others have not been urged in petitioners' briefs and are deemed to have been abandoned.

GENERAL FINDINGS OF FACT.

The facts are partly stipulated and, to the extent so stipulated, are incorporated herein by reference.

All of the petitioners filed timely Federal income tax returns for the years involved with the then collector of internal revenue for the twenty-first district of New York.

Petitioners Albert Averbach, Theodore C. Bonney, and David M. Hayman are attorneys at law who have actively engaged in the practice of law for many years.

It is stipulated in respect to each of petitioners, *inter alia*, that,

During the years 1936 to 1947, inclusive, petitioner was engaged in a number of promotional business ventures. He made loans, advances and gave other financial assistance to said ventures in varying amounts. He also spent [*sic*] a great deal of time and effort to [*sic*] the various enterprises. * * *

Petitioners' various promotional activities until 1939, as they appear from the record, were as follows.

*Albert Averbach.*—In 1934 Averbach investigated the possibility of promoting a door-to-door sale of Eugenie Products cosmetics. In 1935 he organized the Music Users Protective Ass'n to combat abuses of ASCAP, and had an interest in the operation of a burlesque theater and a nightclub. In 1936 he investigated the possibility of acquiring a razor blade company,[1] and of promoting Sam Chiodo's hair dye preparation; he also had an interest in the promotion of a single motion picture called "A Clouded Name," and in the operation of a nightclub. In 1937 he investigated the possibility of promoting or marketing numerous formulas, patents, devices, products, and business ideas, such as suntan oil, mosquito repellent, a self-expelling can, "bladeaway," a liquid dentifrice, fireproof cloths and fabrics, the sale of perfume through vending machines, the Hunt Club line of men's toiletries, Ponaris Tooth Ache Poultice, Syroco Dog Banks, a new type electric razor, the Mary Scott Powland line of cosmetics, Tiny San, a display package case for 10 cent items, a woman's magazine,[2] the establishment of a chain of milk bars, Chill-Chest icebox, sale of an automobile hinge, Consention Can Opener, sale of advertising space on electric clocks, acquisition of closed motion picture theaters, Kanfoush Insecticides, Mochatelle (a South American drink), a display case for the sale of low-priced drug items, an educational film, patents of Miss Beulah Louise Henry (Lady Edison), construction of radio cabinets, and the organization of the textile industry on the employer level.[3] In 1938 Averbach investigated possible promotion of a tele-

[1] Albert Towers also participated.
[2] Albert Towers also participated in the investigation for all of the aforementioned items and ideas in 1937. Theodore Bonney took part in the investigation of Tiny San.
[3] Theodore Bonney participated in investigating the last 11 items and ideas.

phone-answering service, the merger of various cosmetic firms,[4] a national lottery, Nuefud, and a car repair credit plan. He also acquired an option on the MacIntyre Iron Mines properties (not subsequently exercised) and organized the American Bar and Restaurant Association for the purpose of supporting legislation to prohibit department, drug, and 5 and 10 cent stores from selling food over the counter. In 1939 he investigated the possibility of promoting a merger of several laundry plants, an electric shave powder, and a cutting surfaces sharpener.[5]

*Albert and Samuel Towers.*—In addition to those promotional investigations in which Albert participated with Averbach as indicated above, he, along with his brother and father, from 1927 to 1929, operated Bonn's Proprietary General Merchandise &. Store (see *infra*, Issue 7) and invested in the construction of a number of single family dwellings. In 1931 the three Towers invested in Pierre Cosmetics (see *infra*, Issue 7). Between 1930 and 1935 Albert and Samuel Towers invested in the distribution of razor blades.

*David Hayman.*—Hayman participated with Albert Averbach in almost all of the promotional investigations as indicated above. In addition, in 1931 Hayman was in the used car business, in 1935 he purchased a part interest in some real estate, in 1936 he participated in the operation of Chimes Discount Company which was engaged in purchasing mortgages on automobiles, and in 1935 and 1938 he invested in Hayman Auto Parts Corporation engaged in purchasing scrap metal.

Some time in 1939, with war impending, Albert Towers, Albert Averbach, Theodore C. Bonney, David M. Hayman, and John Balch, now deceased, (hereinafter sometimes referred to as the group of five, the first four of whom are petitioners in this proceeding) became interested in a promotional service whereby many of the country's idle machine facilities might be utilized in the production of war materials. To put their plan into effect they organized a partnership, in July 1940, under the name of Aircraft & Arms Procurement Company (hereinafter called Aircraft), maintaining offices in the Chimes Building in Syracuse, New York, and in New York City. Engineers, office personnel, and others were hired. Individuals were sent around the country to locate machine shops which were not then actively engaged in full-time production and to interview the owners. Frequently, the Aircraft partners undertook this task themselves. If a shop was interested in engaging in war work and in participating in the Aircraft program, its full production facilities were analyzed, catalogued, and indexed. This information, including the size and location of the

---

[4] Albert Towers also participated.

[5] Albert Towers also participated.

plant, number of employees, and the different kinds of machine tool equipment owned, was published in a prospectus of shops available in various locations for war work. The prospectus was then offered to the large producers of war materials in both the United States and Canada, such as General Electric, General Motors, Curtiss-Wright, Chrysler Motors, Ford Motor Co., Douglas Aircraft, Boeing Aircraft, and others. The offer was made through an extensive mailing program, and large quantities of advertising in various trade magazines such as Aerosphere, American Machinist, different annuals of the aircraft industry, the New York Times and the N. Y. Herald Tribune, and the classified directory of the telephone company. Essentially, Aircraft, through its activity and publication, acted as a "clearing house" for the prime contractors with Government orders to locate subcontractors with machine equipment available for production. At one point, Aircraft's canvas covered 105 different plants. In this way a number of contractors and subcontractors were brought together for the production of war materials, alleviating in some measure the production "bottleneck" caused by mobilization.

In addition to its listing service, Aircraft supplied many of the smaller shops with engineering advice. Aircraft broke down the operative steps of production for certain assembly items, categorizing the separate operations and component parts. On the basis of this service, Aircraft would suggest to large producers what kind of work could be handled by the various small shops with the equipment they had available.

Subsequently, Aircraft was incorporated as Aircraft & Arms Consultants, Inc. (hereinafter called Aircraft Co.). After incorporation, its consulting and information service was expanded to include 216 different plants.

In connection with the activities of first Aircraft, and then Aircraft Co., Albert Towers managed the New York City office and often traveled about the country to interview owners of manufacturing plants and to show the blueprint requirements of prime contractors. Expenses in this regard for maintaining the New York City office, traveling between the New York City office and the Syracuse office, the New York City office and Washington, and to various plants where it was necessary to go to interview prime and subcontractors, were advanced by Albert Towers. The other partners, later stockholders, also took an extensive and active part in the management and operation of the organization.

In 1941, as a result of their experience in 1940 and 1941 with Aircraft and Aircraft Co., the group of five became interested in undertaking prime contract work. At that time Morris Machine Works (hereinafter called Morris), located in Baldwinsville, New York, had a

large plant available for war work. Morris, however, did not have any previous manufacturing experience and did not have sufficient engineering knowledge to undertake such activity. Petitioners Averbach, Bonney, Albert Towers, Hayman, and John Balch (Balch being an industrial engineer who had previously managed various types of industrial manufacturing plants) organized a corporation with Morris under the name of Balch-Morris, Inc. (hereinafter called Balch-Morris), later renamed Rumsey Manufacturing Corporation (hereinafter called Rumsey Mfg.). The plant was equipped, and Balch-Morris obtained prime contract work on certain Naval gun mount components.

Later in 1941, the group of five, through their activities in Aircraft Co., learned that if the appropriate type of plant could be purchased, a Government contract for the manufacture of suspension units (undercarriages) for the Mark III Valentine, a British tank, could be obtained. The plant of Rumsey Pump Co., in Seneca Falls, New York, was located, and upon examining the equipment it was found adaptable to the special type of manufacture. The group of five purchased the plant by making a deposit of $25,000 which was borrowed on a note endorsed by each member of the group. The remainder of the purchase price, $180,000, and working capital was obtained by a loan from the Schroder Trust Company of New York City (hereinafter called Schroder), guaranteed personally by each of the group of five.

The contract was actually obtained and the Seneca Falls plant began to operate in January 1942. At the same time, pursuant to certain negotiations (described *infra*, Issue 5) between Morris and the group of five, all operations of Rumsey Mfg. (Balch-Morris) were centered in Seneca Falls. Eventually that plant operated on 3 shifts, 7 days a week, with a top number of 850 employees. At various times, from 1941 to 1945, Rumsey Mfg. became subcontractors and prime contractors on other jobs. At the peak of its operation, this plant had a fifteen million dollar volume of sales. During the course of its operation, Rumsey Mfg. availed itself of the facilities of Aircraft Co. and undertook such work as the manufacture of a TBY–2 landing gear as a subcontractor for Consolidated Vultee Aircraft Corp., fuse adapters for the United States Hoffman Manufacturing Corporation, truck parts and "subassemblies" for Chrysler Motors, and brackets, manifolds, and manifold covers for the Rolls Royce engine, used on American and British ships, for the Packard Motor Car Co., and for Continental Motors.

Briefly, during part of 1942 and 1943, Albert Towers, John Balch, Theodore C. Bonney, and Samuel Towers interested themselves in a venture organized as Seneca Farms Corporation (hereinafter called Seneca Farms) to raise hogs. In this connection the company was

awarded a Government contract on the basis of competitive bidding to purchase the garbage disposal from the mess halls of the Sampson Naval Base. This operation did not progress any further and was not successful. Eventually it was abandoned because certain loans necessary to operate the farms were not approved by a Washington agency. The corporation, however, had other powers under its charter and the corporate structure was subsequently used to engage in the construction of six homes in the village of Waterloo. Only Albert and Samuel Towers participated in this aspect of the venture.

In 1945 the group of five became interested in a project known as Seneca Frozen Food Lockers. A partnership was organized to rent frozen food locker space to members of the local community. The project progressed to a point where petitioners contemplated buying land from Rumsey Mfg. on which to build the locker plant, located a manufacturer of freezing equipment, advertised for customers, and rented the total capacity of locker space. The project was abandoned because the approval required for financing and operating it was not obtained from the Federal Government. Petitioners devoted only a small amount of time to this project.

During the years of World War II, the group of five devoted most of their time to the operation of the Seneca Falls plant. Bonney succeeded John Balch as president, Albert Towers became vice president and general manager, Hayman—secretary-treasurer, Averbach—vice president and general counsel, and Balch—chairman of the board of directors and chief engineer.

Petitioners' income tax returns for the years in question disclose that Samuel Towers derived all of his income for the years 1945, 1946, and 1947 from services rendered as an employee of Rumsey Mfg. In 1944, 1945, and 1947 Averbach reported $2,300, $1,900, and $600 from Rumsey Mfg. and $22,701.95, $26,847.68, $17,500, and $18,438.49 in 1944, 1945, 1946, and 1947, respectively, from the practice of law. Albert Towers reported $25,566.22, $31,605.79, and $19,519.15 from Rumsey Mfg. in 1944, 1945, and 1946, and $2,084.95, $879, and $500 in the same years from the business of "Sales Counsel." In 1947 he reported $2,850 from Rumsey Mfg. only. In 1944, Bonney reported $24,938.91 from Rumsey Mfg., $783.17 from the operation of a farm, and a loss from his law practice. In 1945 he reported $29,-594.26 from Rumsey Mfg. and again reported a loss from his law practice. In 1946 he reported $17,500 from Rumsey Mfg., $1,905.20 as a loss from his activities as "Lawyer and Executive," and $6,500 as a loss from his law practice. In 1947 he reported $2,850 from Rumsey Mfg., $150 from Climax Firebrick Co., and $9,374.02 from his law practice. In 1944, Hayman reported $20,939.73 from Rumsey Mfg. and $500 as an "attorney." In 1945 and 1946 he reported

income only from Rumsey Mfg. in the amounts of $26,692.28 and $16,153.90, respectively. In 1947 he reported $4,533.33 from Rumsey Mfg. and the practice of law, without segregation.

Except for the time which Averbach, Bonney, and Hayman devoted to the practice of law, most of petitioners' activities were directed to the operation of Rumsey Mfg. from 1942 to July 1947, and to the operation of Rumsey Products, Inc. (hereinafter called Rumsey Products) from November 1946 to July 1947. Averbach's main activity was the practice of law.

By October 1945, the Government had terminated its war contracts with Rumsey Mfg., tying up virtually all of its working capital of $850,000 to $1,000,000 in unpaid termination claims which were being questioned by the Government. After investigating several organizations and various products for the purpose of undertaking peacetime production, the group of five decided that it was "most prudent * * * to form a new corporation and to supply that new corporation with working capital." The group of five implemented their decision by organizing Rumsey Products in November 1946, to manufacture electric lawn mowers and automotive jacks (2-ton capacity garage jacks). Rumsey Products was to supply the materials and Rumsey Mfg. was to supply the labor at a contract price.

The capital structure of Rumsey Products consisted of 1,000 shares with a par value of $100 each, and 1,000 shares without par value. The total capitalization of Rumsey Products was $100,000, representing paid-in capital. Each of the group of five contributed one-fifth, or $20,000, in cash. In return, each received 100 shares of preferred stock and 200 shares of common stock.

Early in 1947 it became clear that the operations of Rumsey Products, for various reasons not pertinent to the issues before us, were not then as successful as petitioners had hoped they would be. It soon became necessary for petitioners to make various short-term loans to the company to meet payroll commitments (described *infra*, Issue 1), and later to make advances to a "motor pool" organized to finance certain of Rumsey Products' purchases (described *infra*, Issue 2). By July 1947, Rumsey Products and Rumsey Mfg. were adjudged bankrupt and petitioners suffered the various losses claimed in 1947. The plant and equipment of Rumsey Mfg. were subsequently sold at public auction and no attempt was ever made to reorganize that company.

After the bankruptcy and following the closing of the plant at Seneca Falls, petitioners attempted to reorganize Rumsey Products. A new plant in which to move equipment for undertaking production was required and, accordingly, petitioners investigated a number of plants and products and also demonstrated publicly the lawn mower

which Rumsey Products had originally undertaken to manufacture. At the same time, petitioners in some measure actively sought new business opportunities. In these connections petitioners variously investigated such possibilities as acquiring and marketing a Porterway Harvester, manufacturing an aluminum milk cap, manufacturing bowling pins, selling electric motors and bonded wire in Canada through a distributor, dealing in certain diamond tools used as cutting instruments in machine shops, exporting certain machine tools constructed with metric systems, and others. Petitioners also took options on certain plants during this time. However, each of these projects was rejected and petitioners permitted the options to lapse. No ventures were actually "launched" by petitioners in 1947. (Expenses incurred by petitioners are the subject of Issue 8.)

Petitioners' promotional business ventures were not continuous and unbroken during the entire period 1936–1947, and did not constitute parts or incidents of a single over-all business. Petitioners, in varying combinations and groups, actively sought a variety of investment and business opportunities at different times and from time to time. Many of their ventures never got beyond the point of preliminary discussion, though others did take shape as potential operating enterprises. Of these, however, a number were never finally carried into operation for various reasons, and others failed at a later time. Few succeeded, and with respect to a large number of these activities petitioners have reported no income in their returns. In many instances, petitioners did devote time and energy, and in a number of such instances, incurred expense in laying the groundwork for participation in an active enterprise.

Subsequent to 1947, several of the petitioners engaged in various business ventures. These, however, were not a part of a business pattern established prior to the taxable years in question, or continued through and after those years.

We find as an ultimate fact that petitioners' activities during the years in question did not constitute a single business or segregable groupings of businesses of promoting, organizing, managing, and financing business ventures.

Detailed findings of fact relating to the respective issues under consideration are hereinafter set forth, numbered to correspond with the particular issue discussed.

FINDINGS OF FACT.

*Issue 1.*

On a number of occasions during the months of June and July in 1947 each of petitioners loaned monies to Rumsey Products in order

that Rumsey Products might meet the then current payroll and other cash commitments. The loans were short-term loans and were made by issuing a personal check to Rumsey Products and simultaneously receiving in return a check from the corporation, usually dated the same as the personal check given. The corporation's checks, however, were drawn on a different bank located some distance away. It was common practice for petitioners very shortly thereafter to deposit the corporate checks to their own accounts. In this way the corporation was able to obtain cash, which it otherwise did not have available, for short periods of time, frequently only a matter of days. In each instance, except those for which a worthless bad debt has been claimed, the corporate checks issued were honored. It was not until a petition in bankruptcy was filed against Rumsey Products that any of the checks received by petitioners from the corporation were returned and payment protested.

The amounts lost on these loans by several of the petitioners were:

| Petitioner | Amount | Date of Rumsey Products' obligations |
|---|---|---|
| Albert Averbach | $3,500 | June 28 and 30 |
| David M. Hayman | 4,000 | July 3 and 9 |
| Samuel Towers | 3,000 | July 5 |
| Albert Towers | 22,000 | June 21 |

Albert Towers' advances previous to June 21, 1947, which were unpaid on that date, were evidenced by 4 promissory notes, bearing 6 per cent interest, issued on June 21, 1947, each in the amount of $5,625, and due respectively on the 25th day of June, July, August, and September of 1947. Other advances were without interest.

These various advances represented loans to the corporation, creating a debtor-creditor relationship between petitioners and the company. The debts became worthless in 1947 when Rumsey Products was adjudicated bankrupt.

OPINION.

*Issue 1.*

Petitioners contend that the loans to Rumsey Products, which became worthless in 1947, were business bad debts arising from their business of promoting, organizing, managing, and financing business enterprises, while the respondent has determined that the losses which were incurred in 1947 resulted from nonbusiness bad debts.

Section 23 (k) (1) allows a bad debt to be deducted in full in the taxable year in which it becomes worthless, if it was incurred in a trade or business. Otherwise, it is treated as a short-term capital loss, and its deduction is subject to statutory limitations. "Business

debt" is defined only by negative implication from subsection (4) of section 23 (k), providing that "the term nonbusiness debt means a debt other than a debt evidenced by a security," as defined elsewhere, and "other than a debt which is incurred in the taxpayer's trade or business." The accompanying regulations, Regulations 111, section 29.23 (k)–6 (derived from H. Rept. No. 2332, 77th Cong., 2d Sess., p. 76; 1942–2 C. B. 431), read as follows:

A non-business debt is a debt, other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business and other than a debt evidenced by a security as that term is defined in section 23 (k) (3). The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section.

The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but *is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer.* If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purpose of this section. [Emphasis supplied.]

In each case the business or nonbusiness character of a debt and the requisite proximate relation of the debt to the business of the taxpayer is a question of fact. Cf. *Robert Cluett, 3rd,* 8 T. C. 1178 (1947).

We think it is well settled that while the business of a corporation is not the business of its stockholders or officers, *Burnet* v. *Clark,* 287 U. S. 410 (1932), and that while a taxpayer may not cloak himself with the business of the corporation, even under circumstances where the corporation appears to be an "alter ego" of the taxpayer, cf. *Omaha National Bank* v. *Commissioner,* (C. A. 8, 1950) 183 F. 2d 899, nevertheless, if a taxpayer makes advances to a corporation either as a stockholder or a corporate executive, any loss incurred as a result of these advances may qualify as a business bad debt if the taxpayer was in reality engaged in the business of promoting, organizing, managing, financing, and making loans to business enterprises, *Weldon D. Smith,* 17 T. C. 135 (1951), revd. (C. A. 2, 1953) 203 F. 2d 310; *Henry E. Sage,* 15 T. C. 299 (1950); *Vincent C. Campbell,* 11 T. C. 510 (1948), in the year in which the loss was incurred, *Hadwen C. Fuller,* 21 T. C. 407 (1953), and if the loss is proximately related to such promotional business. As we pointed out in *Charles G. Berwind,* 20 T. C. 808, 815 (1953), this rule is "applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations * * * [may be] regarded as so extensive as to constitute a business separate

and distinct from the business carried on by the corporations them-selves." It is equally apparent that an individual may make a loan and suffer a loss therefrom under circumstances unrelated to his business even though his business be that of financing and making loans.

The record before us indicates that for a number of years up to 1939, when the group of five first organized Aircraft, petitioners had actively sought a variety of investment and business opportunities. Many of these activities never materialized after preliminary investigation and discussion. Some did develop to a greater degree but never went into operation. Others failed at still a later point. Few, if any, seem to have ever succeeded. Nevertheless, it is conceded that petitioners devoted time and energy and often incurred expense in laying the groundwork for participation in an active enterprise. It is also stipulated that each of the petitioners made loans and advances and gave other financial assistance in varying amounts to these ventures.

In 1940, the group of five organized and operated Aircraft and Air-craft Co., which, according to the testimony, were not ultimately very successful, presumably because the need for such a subcontracting "clearing" service diminished rapidly as wartime production got into full swing. As a result of their activities in Aircraft and Aircraft Co. the group of five were able to secure prime contracts, work on which was begun in 1942, first through Balch-Morris and then Rumsey Mfg., the successor corporation.

In the record are stipulations of facts which include, *inter alia*, the following in respect of each of the petitioners:

During the years 1936 to 1947, inclusive, petitioner was engaged in a number of promotional business ventures. He made loans, advances and gave other financial assistance to said ventures in varying amounts. He also spent [*sic*] a great-deal of time and effort to [*sic*] the various enterprises.

We, of course, give effect to such stipulations as far as they go. We point out, however, that no details are set forth therein, and there is no basis on which we may construe them to the effect that the parties to this proceeding agreed that the aggregate of the various promotional ventures, or any one or more of them in which petitioners engaged (frequently, but not always, together) over the period of years 1936 through 1947, constituted parts of a single business or of a grouping of businesses of promoting, organizing, managing, and financing business ventures in each of those years. Moreover, the stipulations contain no statement or agreement that the activities of petitioners in relation to Rumsey Mfg. from 1942 to 1947, inclusive, or Rumsey Products in 1946 and 1947 constituted a business or were integral factors in any business carried on by them or any of them during those years.

It appears from the record that other than some time given by Bonney and Hayman to their law practices, most of the activities of

petitioners Albert Towers, Bonney, and Hayman from 1942 to 1946, inclusive, were as officers, directors, and employees of Rumsey Mfg. The same may be said with respect to Samuel Towers, except that he was an employee and not an officer or director.   During this period, Averbach devoted most of his time to the practice of law, but was also active as an officer, director, and employee of Rumsey Mfg.   It also appears that for this period substantially all of petitioners' respective incomes were derived variously from the practice of law and from their services to Rumsey Mfg.

When it became necessary to convert to peacetime production, petitioners, on behalf of the company, actively sought products which they might manufacture, and ultimately, because of disputes over termination orders, organized Rumsey Products in November 1946.   Rumsey Products, however, was to operate through the facilities of Rumsey Mfg. and did not in reality represent a new enterprise.   It was essentially a peacetime continuation of the operations previously carried on by Rumsey Mfg.   Petitioners served the new corporation in the same manner as they had Rumsey Mfg., in addition to which Bonney, Averbach, and Hayman continued to devote time to the practice of law.   It was not until the fall of 1947, after Rumsey Products was adjudged bankrupt, that petitioners, as individuals, once again renewed their efforts in seeking various business opportunities, which in some measure they have continued to do to date.

We do not think that for the year 1947 petitioners were, in fact, actively engaged in any business of promoting, organizing, managing, and financing insofar as their services to Rumsey Mfg. and Rumsey Products are concerned within the intendment of the rule heretofore stated.   *Hadwen C. Fuller*, *supra*.   Nor do we think that the frequent loans to Rumsey Products in the months of June and July of the year in question represented either a business in and of itself, or a part of a business which consisted of promoting, organizing, managing, and financing business enterprises.   The loans appear to have been merely accommodation advances made from necessity, because of petitioners' practical interest in the company.   We find nothing in the vague generalities set forth in the stipulations of fact, or any other circumstances in the record which support the view that the loans or advances in question were made as a part of the activities of any business consisting of the lending of money generally, or the promoting and organizing, managing, financing, and making of loans to Rumsey Mfg. and later Rumsey Products.

In the light of the foregoing we hold that the loans in question, which became worthless in 1947, were nonbusiness bad debts. *Jan G. J. Boissevain*, 17 T. C. 325 (1951) ; *A. Kingsley Ferguson*, 16 T. C. 1248 (1951) ; *Estate of William P. Palmer, Jr.*, 17 T. C. 702 (1951).

FINDINGS OF FACT.

*Issue 2.*

On February 3, 1947, the board of directors of Rumsey Products took the following action:

Upon motion made, seconded and duly and unanimously carried the President of the Corporation was authorized and directed to enter into an arrangement for the handling of sight draft shipments of electric motors for the production of electric lawn mowers, such arrangements being set forth in Exhibit A attached hereto and made a part of these minutes.

Exhibit A attached to the minutes was an original letter as follows:

FEBRUARY 3, 1947.

Mrs. ROSE TOWITZ,
   *123 Cayuga Street, Seneca Falls, New York.*

DEAR MRS. TOWITZ: This letter is to confirm our recent oral understanding. This company as a part of its electric lawn mower program has a larger [*sic*] order placed with Jack & Heintz for a [*sic*] ½ H. P. electric motors. These motors were originally scheduled for delivery at the rate of 5,000 motors per month commencing December, 1946, and purchases of all other materials and parts were made to conform to the motor delivery schedule.

Meanwhile, the motor deliveries have been delayed so that, while we have large sums of money invested in other inventory, we are short of cash funds to meet sight draft shipments of motors which are now beginning to arrive at frequent and unannounced times. It is essential that we be prepared to meet these sight drafts promptly and adequately and our present banking arrangements are not adapted to this particular requirement in respect to motors.

We therefore have asked you, acting for yourself and certain persons for whom you are agent, to take over the function of handling these sight draft shipments of motors during such period of time as may be necessary, but not longer than until December 31, 1947, for which services we will pay you, acting for yourself and as agent, the sum of fifty cents ($.50) for each motor in respect to which you render such service. At all times during the continuance of this arrangement, you shall have the right to request and immediately receive from us a lien upon the motors to which you are rendering such service, subject, however, to any liens of Manufacturers Trading Corporation or Lawrence Warehouse Co.; or in the alternative you may at any time request and receive title to such motors, subject to any such above mentioned liens as may exist.

    Yours very truly,

RUMSEY PRODUCTS, INC.,
By: THEODORE C. BONNEY,
*President.*

  Accepted:
    ROSE TOWITZ,
      *Individually and as Agent.*

Pursuant to this agreement Albert Averbach, David M. Hayman, Albert Towers, and Samuel Towers each advanced to a so-called Rose Towitz Pool, $4,500, $4,500, $5,000, and $5,000, respectively, of their own personal funds, as their "capital investments" in the "motor pool." These advances did not correspond with the individuals'

stockholdings in Rumsey Products. The company had five equal stockholders. Samuel Towers, who contributed $5,000, was not a stockholder. Theodore C. Bonney and John Balch, each stockholders, made no contributions to the "motor pool," and Albert Towers, a stockholder, contributed $500 more than either David M. Hayman or Albert Averbach.

While an account notation on the books of Rumsey Products, set out below (Exhibit 3 attached to the stipulation of facts), does not fully accord with these facts, we nevertheless accept them as stipulated.

*Account of Rose Towitz*

April 17, 1947

|  | *Cr.* |
|---|---|
| February 14, Rose Towitz C. R. #7 | $6, 000. 00 |
| March 12, Rose Towitz P. R.—Invoice | 5, 000. 00 |
| March 17, Rose Towitz P. R. Voucher | 11, 006. 35 |
|  | $22, 006. 35 |
| Cash balance in R. Towitz account | 493. 65 |
|  | $22, 500. 00 |

Contributions:

| | |
|---|---|
| Albert Towers | $5, 000. 00 |
| Sam Towers | 1, 500. 00 |
| D. M. Hayman | 4, 500. 00 |
| Albert Averbach | 4, 500. 00 |
| T. C. Bonney | 3, 500. 00 |
| John Balch | 3, 500. 00 |
|  | $22, 500. 00 |

The significant function of the petitioners who contributed to the "pool" was to supply the needed funds, for which they were to receive 50 cents per motor from Rumsey Products. All of the motors were in fact turned over directly to Rumsey Products to be used in the manufacture of finished lawn mowers. Likewise, the funds contributed were used by or for Rumsey Products to finance the sight draft shipments.

The effect of these transactions was to extend credit to Rumsey Products through the pool, for an agreed consideration of 50 cents per motor. The advances were, in essence, loans to the company, although nominally made as contributions to an investment pool organized to make a profit. As a result, Rumsey Products was able to accept shipments which it would not otherwise have been in a position to handle. The amounts contributed to the "pool" were turned over to Rumsey Products, to be carried in the specially designated "Rose Towitz account," hereinbefore set out, on which account Rumsey Products would draw to accept sight draft shipments of motors.

There was no operating intermediary. The whole arrangement was for the purpose of making available to Rumsey Products funds which Rumsey Products itself could not furnish, Rumsey Products agreeing to pay 50 cents per motor for such financing service.

Petitioners were not at any time engaged in the business of buying and selling motors for lawn mowers.

The monies advanced by the contributors to the Rose Towitz Pool were totally lost as a result of the Rumsey Products bankruptcy in 1947.

OPINION.

*Issue 2.*

Each of petitioners who contributed to the Rose Towitz Pool claimed a deduction in his 1947 tax return to the extent of the respective amounts contributed, and asserts as a basis therefor the several grounds of business loss, business bad debt, and loss incurred in a transaction entered into for profit. Respondent disallowed the deductions.

Losses which are incurred in a trade or business under section 23 (e) (1), or in a transaction entered into for profit under section 23 (e) (2), are deductible in full. Worthless business bad debts are likewise deductible in full under section 23 (k) (1). Nonbusiness bad debts, however, are traded as short-term capital losses. Sec. 23 (k) (4).

The Code provisions for deducting losses and worthless debts are mutually exclusive. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182 (1934). A single transaction may not qualify as both a bad debt and a loss. We must first determine, therefore, whether the worthless contributions to the Rose Towitz pool are to be characterized as bad debts or as losses.

Upon the record before us, we hold that the monies advanced to the "pool" were in reality loans or advances to Rumsey Products (largely for the convenience of that company, in which all of the contributors were directly or indirectly interested) to enable the company to finance the purchase of motors, of which delivery could not otherwise have been accepted by Rumsey Products as sight draft shipments. There is nothing in the record to suggest that the contributors intended to buy the motors for resale to Rumsey Products or any other purchaser, or that any loss might be attributed to such resale. It is clear that the contributors looked to Rumsey Products for ultimate reimbursement from the proceeds of its expected resale of the motors (as a part of electric lawn mowers) in accordance with the company's "electric lawn mower program." (See Exhibit A, *supra.*) The necessary result of the transaction was a debtor and creditor relationship. We do not think that the charge of 50 cents per motor referred to in

Exhibit A as a payment for "services" in any way affects this conclusion. Upon the eventuality of worthlessness, therefore, the amounts due the contributors for their loans or advances became bad debts.

We must next determine whether the items were business or nonbusiness bad debts. Section 23 (k) (1), allowing deduction of worthless bad debts in full, contains the following exception:

> This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a nonbusiness bad debt, as defined in paragraph (4) of this subsection.

The material provision in section 23 (k) (4) referred to in section 23 (k) (1) is as follows:

> The term "non-business debt" means a debt * * * other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

We think that the dominant purpose for the contributions to the "pool" was to advance the interests of Rumsey Products by enabling it to finance the sight draft shipment of motors which it would otherwise have been unable to do. The interest of the contributors, directly or indirectly, in Rumsey Products is apparent from the record. Despite this, we assume for the purpose of our discussion that the contributors entered into the transaction for profit, since they were to receive 50 cents for each motor delivered. It is obvious, however, that not every transaction entered into for profit necessarily constitutes a trade or business, or that every debt arising in relation thereto was incurred in a trade or business.

It is clear upon the record that the contributing petitioners were not in the business of buying and selling motors for lawn mowers, and neither the stipulations nor the testimony establish that the advances to Rumsey Products were made in connection with or as a part of any then existing business of promoting, organizing, managing, financing, or making loans to Rumsey Products or any other enterprise or enterprises. The testimony relating to activities involving promotions, loans, and financing is vague and general, particularly as to the years before us, including 1947, and much of it is in answer to leading questions stereotyped in form. Whatever the business activities of the contributing petitioners may have been in 1947, the testimony does not relate them to Rumsey Products or the "pool" transaction. The same comment applies to the stipulations. Whatever they may be intended to convey, they are not phrased to include the transaction in question. If they had been intended by the parties to be applicable to this issue, it would have been quite easy to have so provided in clear terms.

We add, for completeness, that there is nothing in the record to show what the duties of Mrs. Rose Towitz (mother of Albert and

Samuel Towers) were in connection with the motor pool, or specifically what was expected of her in relation to acceptance of motor deliveries.

On the basis of the foregoing, we must conclude that the items in question, having become worthless in 1947 and not having been incurred in a trade or business, must be treated as nonbusiness bad debts.

FINDINGS OF FACT.

*Issue 3.*

On April 24, 1947, the board of directors of Rumsey Products passed a series of resolutions, shown in the corporate minutes, in form substantially as follows:

Upon motion duly made, seconded and carried, it was resolved that _____ _____, be and he hereby is authorized to execute a bill of sale to _____ on the terms and conditions set forth in Exhibit A hereto attached covering the sale of _____ completed electric lawn mowers for the sum of _____.

Such resolutions were passed in respect to Albert Averbach and Albert Towers for the sale of 100 lawn mowers to each at $5,000. Two resolutions were passed for the sale of 200 and 300 lawn mowers for $10,000 and $15,000, respectively, to Samuel Towers. The record does not include any resolution for the sale of 100 lawn mowers to Hayman. Attached to the minutes were executed copies of "bills of sale," as follows (alike in each case, with the exception of the names of the parties to the transaction, and the amounts involved):

*Bill of sale*

KNOW ALL MEN BY THESE PRESENTS, That Rumsey Products, Inc., a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York and having its principal office and place of business in the Village of Seneca Falls, County of Seneca and State of New York, for and in consideration of the sum of Five Thousand Dollars ($5,000.00) the receipt whereof is hereby acknowledged in hand paid by Albert Averbach, of R. F. D. #6 in the City of Auburn (Sennett), County of Cayuga and State of New York, does hereby grant, sell, transfer and deliver to the said Albert Averbach, one hundred (100) completed electric lawn mowers, Serial Numbers as follows:

*   *   *   *   *   *   *

said electric lawn mowers to be stored at the Johnston Street plant of Rumsey Products, Inc. awaiting shipping instructions from the said Albert Averbach, and to be covered by Rumsey Products, Inc. insurance policies.

IN WITNESS WHEREOF, the said corporation has caused its corporate seal to be hereunto affixed, and these presents to be signed by its duly authorized officer this 24th day of April, 1947.

RUMSEY PRODUCTS, INC.<br>By ALBERT TOWERS, *V. P.*

Attest:<br>
D. M. HAYMAN,<br>
*Secretary*

STATE OF NEW YORK
County of Seneca        ss:
Village of Seneca Falls

On this 24th day of April, 1947, before me personally came Albert Towers, to me personally known who, being duly sworn by me deposed and said that he resides in Seneca Falls, New York, that he is the Vice-President of Rumsey Products, Inc., the corporation described in and which executed the foregoing Bill of Sale; that he knows the seal of said corporation; that the seal affixed to said Bill of Sale is such corporate seal; and that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

                              Harry E. Horton
                              HARRY E. HORTON
                              Notary Public, State of
                              New York, Seneca Co., No. 117
            My commission expires March 30, 1949

Petitioners Albert Averbach and David Hayman each paid to Rumsey Products, from his personal funds, $5,000 by check for 100 completed lawn mowers. Albert and Samuel Towers went into the transaction together and paid $25,000, and received a "bill of sale", for 500 completed lawn mowers.

Samuel Towers paid for the mowers by issuing two checks, one dated April 1, 1947, drawn on the Seneca County Trust Co. and payable to Rumsey Products, for $10,000, and the other dated April 11, 1947, drawn on the Seneca County Trust Co. and payable to Rumsey Products, for $15,000. Albert Towers agreed to share equally with his brother, and contributed his share of $12,500 by issuing to his brother a check dated April 10, 1947, drawn on the First Trust and Deposit Co., for $10,000, and a check dated April 11, 1947, drawn on the Seneca County Trust Co., in the amount of $2,500.

One purpose of these transactions was "to make available to the corporation the money." The money received by the corporation was used to meet payrolls, to purchase materials, and to pay bills. We find, however, that the dominant purpose was to make a profit through the purchase and sale of merchandise. The opportunity presented itself because Rumsey Products was not in a position to sell to certain concerns who were not considered sufficiently good credit risks by the institution which was backing the company financially. Petitioners intended to sell only to these concerns, and were willing personally to assume the financial risk.

As a result of the adjudication in bankruptcy of Rumsey Products in 1947, the petitioners involved in these transactions never received any lawn mowers, and each sustained losses accordingly.

OPINION.

## Issue 3.

Each of the petitioners claimed their respective losses as business losses, business bad debts, or losses incurred in a transaction entered into for profit. Repondent has disallowed these losses.

We think there can be no doubt that the transactions in question were entered into for profit. We do not regard the fact that the corporation also benefited by the availability of the money paid in by petitioners as requiring any different conclusion. We do not agree with respondent's contention that since the corporation could have obtained these monies from petitioners directly in the form of loans, the transactions were a "sham." Petitioners were free to handle the transaction in any manner and on any basis which they saw fit.

Having reached the conclusion that the transactions were entered into for profit, we again must consider whether the resulting worthlessness in 1947 is to be deemed a loss within the meaning of section 23 (e) (2) or a bad debt within the meaning of section 23 (k).[6]

In *Lewellyn* v. *Elec. Reduction Co.*, 275 U. S. 243 (1927), the Supreme Court, in considering an issue arising out of prepayment for merchandise followed by a failure to deliver, said in part:

The buyer's rights were upon a contract for the delivery of merchandise and were not a "debt" in either a technical or colloquial sense. We conclude that if respondent's contract rights became worthless in 1918 he was not required to deduct his loss as a worthless debt * * * but was entitled to deduct it * * * as a loss sustained in that year.

We think the principles so announced in *Lewellyn* v. *Elec. Co.*, *supra*, are applicable to the facts presented by Issue 3 and we hold that petitioners are entitled to deduct their losses under the provisions of section 23 (e) (2).

FINDINGS OF FACT.

## Issue 4.

In 1941, John Balch assigned a four-fifths interest in certain claims for commissions, due him from Morris, which passed equally to Albert Averbach, Albert Towers, Theodore C. Bonney, and David M. Hayman. This group subsequently reassigned the claims to John Balch who assigned them in turn to Balch-Morris, the predecessor corpora-

---

[6] In view of our holding that the transaction was entered into for profit, it is unnecessary, in discussing Issue 3 to consider whether the transactions also arose in the operation of a business. The latter question arises, however, in connection with the problem of net operating loss carry-backs, and is considered under Issue 9.

tion to Rumsey Mfg., to be used by Rumsey Mfg. (Balch-Morris) as collateral (in the approximate value of $33,000) in conjunction with the loan from Schroder. The assigned claims were carried on the books of Rumsey Mfg. (Balch-Morris) as a "Donated Surplus Account" which was credited with $28,381.50. It was understood that the assigned claims, or the proceeds therefrom, would be reassigned or distributed to the assignors when no longer needed to obtain credit. Meanwhile, the assignors' right to demand repayment was subordinated to the rights of creditors and preferred stockholders of Rumsey Mfg. (Balch-Morris).

In 1943, Rumsey Mfg. received $28,381.50 on these claims by way of setoff of a claim of Morris against Rumsey Mfg.

On October 1, 1945, Rumsey Mfg. repaid this amount to the above-named individuals in accordance with its prior agreement. A pertinent portion of the resolution adopted at a special meeting of the board of directors of Rumsey Mfg. on that date was as follows:

whereas all of the debts of the corporation have now been paid or payment adequately provided for, and there now being no preferred stock of the corporation outstanding * * * and due demand having been made, it is

RESOLVED, that the sum of $28,381.50, being the proceeds of said accounts receivable, be repaid to said John Balch, Theodore C. Bonney, Albert Averbach, David M. Hayman and Albert Towers, in equal amounts of $5,676.30 each. * * *

The preferred stock of Rumsey Mfg. had been called for redemption the same day. (See *infra*, Issue 5.)

Each of the members of the original group of five received $5,676.30 from Rumsey Mfg., the total amount representing the proceeds of the John Balch claims for commissions. The group of five owned the stock of Rumsey Mfg.

Each of the petitioners who were involved in these transactions, other than Hayman, considered the original assignment as a gift from John Balch. Hayman received his interest therein by virtue of becoming a partner of the other four. The record does not establish Hayman's basis, as a partner, in the assets given or assigned by Balch, and does not establish any basis in the hands of Balch, as donor, with respect to the interests given or assigned to Averbach, Albert Towers, and Bonney. The petitioners affected, including Hayman, treated the amounts received in 1945 as the repayment of a loan which they had made previously to Rumsey Mfg. (Balch-Morris), then in the form of assigned claims from John Balch against Morris. These petitioners did not include as income, in their respective Federal income tax returns for any year, any part of the amount received in the year 1945. Respondent construed the transaction as a distribution by Rumsey Mfg. of profits, taxable to each of the petitioners involved as dividend income in the amount of $5,676.30.

The distribution by Rumsey Mfg. to petitioners was in fact the repayment of a loan or obligation and was not a dividend.

The assignment by John Balch of an interest or interests in his claims for commissions to Averbach, Albert Towers, and Bonney, whether as individuals or as partners, constituted a gift.

OPINION.

*Issue 4.*

The issue as presented to us is whether the distribution of the "Donated Surplus Account" in the amount of $28,381.50 by Rumsey Mfg. in 1945 to petitioners Averbach, Albert Towers, Bonney, and Hayman represented the repayment of a loan previously made by petitioners to Rumsey Mfg. or was a dividend. Although, as will appear, *infra*, we do not think it makes any difference, upon the record before us, which way the items are treated, we think we should resolve the issue as presented, so that the parties may fully understand our approach.

Whether the transaction involving the assignment to Rumsey Mfg. of the "Balch claims" was the repayment of an obligation or a dividend is a question of fact. We think that the stipulated facts, while not agreeing in every particular with some of the evidence adduced at the hearing, in all material respects point clearly to the assignment of the "Balch claims" to Rumsey Mfg. for an express and limited purpose. The assigned claims were to be used by Rumsey Mfg. to secure a loan from Schroder and it was expressly understood by the petitioners and Rumsey Mfg. (Balch-Morris) that the assigned claims, or the proceeds therefrom, would be reassigned, or distributed, to the assignors when no longer needed to obtain credit. The value of the claims realized by Rumsey Mfg. in 1943 was in fact paid over to petitioners in 1945, at which time the board of directors of Rumsey Mfg. were of the opinion that Rumsey Mfg.'s other outstanding obligations had been satisfied and at which time the preferred stock of the corporation was no longer outstanding. Furthermore, it is pertinent to note that at all times the "Balch claims" were carried on the books of Rumsey Mfg. as a special account and were not commingled with any other surplus account.

We hold that the distribution was in repayment of an obligation from Rumsey Mfg. to said petitioners. We must, therefore, consider the nature of the transaction by which petitioners acquired their share of the assigned claims (whether by gift or otherwise) and also determine the basis in their hands.

In a manner and for reasons which are far from clear on the record, John Balch, in 1941, assigned a four-fifths interest in certain claims

for commissions due him from Morris. It is not altogether clear from the record as to whether the portions of the interest passing to Averbach, Albert Towers, and Bonney passed to them directly or as members of a partnership with Balch. In all events, a partnership was formed, which Hayman "bought into," and the parties regarded Averbach, Albert Towers, Bonney, and Hayman each as owners of a one-fifth interest in the claims.

Petitioners urge that the assignment of the four-fifths interest was a gift from Balch. While this view is a strain upon our credulity, it represents the uncontradicted testimony (except as to Hayman, with respect to whom the distinction is immaterial) and we accept it. We also call attention to the fact that respondent urges that there was no consideration for the transfer. We may add here that it is our view, as will appear, *infra*, that upon the record, it does not make any difference in the conclusion which we must reach.

Since we accept the view that the interests transferred by Balch to Averbach, Albert Towers, and Bonney were gifts, we must next turn to the question of basis. While the evidence may be sufficient for us to value the interests at the time the gifts were made, there is no testimony whatever as to any basis in the hands of Balch, the donor. The claims appear to have represented commissions due Balch for services, but there is nothing in the record to establish that he ever reported the claims or their value as income for tax purposes, or in any manner acquired a basis therefor. In the absence of evidence to the contrary, we must find a zero basis, since the three petitioners have failed to meet their burden of proof.

As to Hayman, if we hold that the transfer to him was a gift, the rule already announced would apply. If he acquired his interest as a partner (which appears to be the fact), he has likewise established no basis for his share of the asset, leaving his basis at zero with attending results as indicated with respect to Averbach, Albert Towers, and Bonney.

Finally, we hold that the amounts repaid to the four petitioners must be treated as ordinary income rather than as capital gains, because there was a mere return of the proceeds of the assigned claims and not a sale or exchange within the meaning of section 117 (a) (2) or (4).

#### FINDINGS OF FACT.

### *Issue 5.*

In 1945, Rumsey Mfg. retired its preferred stock, each share having a par value of $100 and a call price of $130 per share plus accrued dividends. Petitioners Averbach, Hayman, Bonney, and Albert Towers each received $2,600 upon the surrender of 20 shares each.

Petitioners reported no income from the retirement of their shares of preferred stock in 1945 or any other year.

The 20 shares of stock held by each of the petitioners were acquired by them in 1943 from Rumsey Mfg. Rumsey Mfg. had obtained them in that same year from Morris which had acquired them originally in 1941 for cash.

In 1941, the group of five organized Balch-Morris to operate the Morris plant at Baldwinsville for prime contract work on war materials. In this connection Morris conveyed a part of its plant to Balch-Morris. It was agreed that Balch-Morris would issue in partial consideration of these arrangements certain preferred stock to be callable at $130 per share plus accrued dividends, and that this stock should be called upon demand of the holder at such time as the financial condition of the company would properly warrant. Morris paid cash for 100 shares of the preferred stock of Balch-Morris and subscribed for 560 additional shares at $56,000. At a later date the original plan to operate the Morris plant at Baldwinsville was abandoned by the group of five, and it was decided to purchase the Rumsey Pump Co. plant at Seneca Falls for war contract production. As a result of this decision, Morris and the group of five, on behalf of Balch-Morris, negotiated an agreement to rescind the original transaction by releasing Morris from its stock subscription for 560 shares of Balch-Morris preferred and by reconveying to Morris its plant and building. In addition, it was agreed that the 100 shares of preferred stock paid for in cash by Morris would be returned to Balch-Morris if the name "Morris" were eliminated from the corporate name "Balch-Morris." In 1943, this stock was returned and the company name was changed from Balch-Morris to Rumsey Mfg., "Rumsey" having been the traditional name of the plant in Seneca Falls for over 100 years.

The 100 shares of paid-up stock were turned over to the group of five in 1943 by Rumsey Mfg. (Balch-Morris), in accordance with an agreement made in 1941, partially as consideration for the assignment by said group of the "Balch claims" to Rumsey Mfg., to be used by Rumsey Mfg. as collateral for the loan from Schroder (see *supra*, Issue 4, for description of this transaction), and also partially as consideration for the service rendered by them in arranging the rescission agreement. The minutes of a special meeting of the board of directors of Balch-Morris, dated December 21, 1941, in pertinent part are as follows:

It was unanimously resolved that in consideration of the assignment of certain accounts receivable from Morris Machine Works to John Balch and subsequently assigned to this corporation all of the right, title and interest of this corporation in and to the certificate for 100 shares of Class A preferred stock now held by Morris Machine Works under an agreement expressed in a letter dated August 27, 1941 are hereby assigned to John Balch, Albert Averbach, David M. Hayman,

*Albert Towers,* and *Theodore C. Bonney* as individuals, share and share alike. After due consideration and upon motion which was made and carried, it was resolved that the 560 shares of preferred stock of the corporation which were turned back to the corporation by Morris Machine Works on or about August 27, 1941 should be considered as having been cancelled as of August 27, 1941 and further resolved that such shares of preferred stock shall have the status of authorized but unissued stock which will mean that the corporation is now authorized to issue 1,000 shares of preferred stock and further resolved that the 101 shares of common stock which were turned back into the corporation on or about August 27, 1941 shall have been acquired by the corporation as Treasury stock and shall not have been cancelled with the result that the corporation now has authorized common stock in the amount of 200 shares, all of which is issued and outstanding. Upon motion duly made, seconded and carried it was unanimously resolved that in consideration for services performed by Theodore C. Bonney in connection with the cancellation of ' the stock subscription of Morris Machine Works and the legal services in connection with the transfer of realty heretofore deeded by the corporation back to Morris Machine Works and the preparation of certain contracts in connection therewith and for the further consideration of $1 the proper officers of this corporation are hereby directed and authorized to issue and deliver to the said Theodore C. Bonney one share of the common stock which shall be one share out of the 101 of common stock now held by the corporation in its treasury as treasury stock.

None of these petitioners reported the stock received as taxable income in 1943.

On October 1, 1945, Rumsey Mfg. resolved to call in all of its preferred stock. The balance sheets of Rumsey Mfg. as of September 30, 1945, and October 31, 1945, are compared below:

| | | |
|---|---:|---:|
| Cash on hand | $701, 832. 37 | $448, 282. 02 |
| Inventories | 38, 466. 74 | 42, 812. 24 |
| Fixed assets | 668, 070. 56 | 663, 189. 70 |
| Total current assets | 1, 859, 993. 03 | 1, 812, 055. 86 |
| Total current liabilities | 1, 135, 672. 94 | 1, 292, 150. 32 |
| Capital surplus | 599, 645. 82 | 527, 264. 32 |
| Earned surplus | 426, 622. 17 | 291, 339. 62 |

There was no diminution of the business of Rumsey Mfg. to which the retirement of the company's preferred stock and the capital represented thereby related, and there were sufficient earnings and profits available to have declared an ordinary dividend. The retirement of preferred stock caused no significant change in ownership in the corporation. We find as an ultimate fact that the distribution was one essentially equivalent to a taxable dividend.

OPINION.

*Issue 5.*

The question presented by Issue 5 is whether the cash distribution made by Rumsey Mfg. in 1945 in connection with the retirement of its

preferred stock was made in partial liquidation or was essentially equivalent to a taxable dividend. Respondent made the latter determination. If the distribution was in partial liquidation, a subsidiary question is presented as to whether the petitioners have established any basis for their preferred stock.

Section 115, which concerns distributions by corporations, provides in subsection (c) that "amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock," thus according any gain realized the benefit of capital gains treatment. A partial liquidation is defined in subsection (i) as a "distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." Superimposed on the treatment accorded circumstances which fit the pattern of a distribution made in partial liquidation is the provision of subsection (g) which requires that, "If a corporation cancels or redeems its stock * * * at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed * * * shall be treated as a taxable dividend," taxable in full as ordinary income.

Whether a distribution in connection with the retirement of preferred stock of a corporation is a distribution in partial liquidation or is a distribution essentially equivalent to a dividend depends on the particular facts and circumstances of each case. Therefore, the numerous cases cited by petitioners where distributions were held not to be taxable under section 115 (g) are not controlling, and we think that, in the circumstances of the instant case, they are of no particular aid in determining the problems before us. The respondent's determination is, of course, presumptively correct and it is incumbent upon the petitioner to show that the distribution was made in partial liquidation.

The principle to be applied in determining whether a distribution is essentially equivalent to a dividend under section 115 (g) is to determine the "net effect" of the distribution. Bad faith in making the distribution is not necessary to characterize it as one essentially equivalent to a dividend, *McQuire* v. *Commissioner*, (C. A. 7, 1936) 84 F. 2d 431, affirming 32 B. T. A. 1075 (certiorari denied 299 U. S. 591), but the taxpayers' motives and the plans and purposes of the corporation in making the distribution are relevant to determining whether or not the "net effect" of the distribution was essentially equivalent to a dividend. Cf. *Flanagan* v. *Helvering*, (C. A., D. C., 1940) 116 F. 2d 937.

In the instant case, Rumsey Mfg. had a large (and perhaps unnecessary) accumulation of cash and sufficient available earnings in its earned surplus account from which an ordinary dividend distribution could have been made. Petitioners have not demonstrated that the distribution brought about any change in the ownership in the corporation or in the investment which petitioners had made in the corporation. Cf. *James F. Boyle*, 14 T. C. 1382 (1950), affd. (C. A. 3, 1951) 187 F. 2d 557, certiorari denied 342 U. S. 817 (1951). We may add that Rumsey Mfg. had not previously paid any dividends.

Petitioners take the position that Rumsey Mfg. retired its preferred stock for business reasons, namely: (1) The capital represented thereby was no longer needed by the company in its operation; (2) the original purpose for issuing this stock in connection with the organization of Balch-Morris had been satisfied; and (3) it was to the advantage of the company to terminate the charge of dividends accruing to this stock. While it is clear that one factor which may be considered in determining whether or not a distribution is essentially equivalent to a dividend is the existence of a valid business purpose for making the distribution, *Joseph W. Imler*, 11 T. C. 836 (1948), it is equally clear that finding business purpose does not necessarily preclude the applicability of section 115 (g). Cf. *Estate of Charles D. Chandler, supra.*

We do not think that the record supports petitioners' contentions.

At the time of distribution, Rumsey Mfg. had not reduced its operating capacity and there was no clear intention to restrict its operating capacity immediately thereafter. The fixed assets of the corporation remained essentially unchanged, and the corporation's inventories were in fact increased slightly. Plans for peacetime production to replace the work on war materials were being discussed. It was not until November 1946, more than a year later, that Rumsey Products was organized, with new capital, to undertake peacetime production through the facilities and working force of Rumsey Mfg. The circumstances of the instant case do not resemble those of *L. M. Lockhart*, 8 T. C. 436 (1947); *Joseph W. Imler, supra;* and *John L. Sullivan*, 17 T. C. 1420 (1952), affd. (C. A. 5, 1953) 210 F. 2d 607, relied on by petitioners, where in each instance there was a contraction of the corporate business with a corresponding reduction in the amount of capital used in the corporate enterprise. See *Estate of Charles D. Chandler, supra.*

Petitioners' contention that it was in accordance with sound business practice to redeem the stock, since the original purpose of issuing the stock had been satisfied, does not seem to us to accord with the facts.

The stock was apparently issued originally to protect Morris' investment in Balch-Morris by certain prior rights which accrued to the preferred stock. This purpose was already satisfied in 1943 when the group of five arranged to operate as Rumsey Mfg. at Seneca Falls and Morris was released from its stock subscription. All of the preferred stock held by Morris was returned to Rumsey Mfg. Retirement, therefore, could have been accomplished in 1943. Morris was no longer interested in the company and the stock which had actually been paid for, representing only a very small amount of the capital to be used in the operation of the company, was then in the control of Rumsey Mfg. Petitioners contend that the preferred stock was distributed to them in 1943 as part of the consideration for an agreement entered into in 1941 for the assignment of the Balch claims, discussed under Issue 4. There is nothing in the record to indicate why additional consideration in this form was essential in view of the agreement to reimburse petitioners to the extent of the Balch claims when Rumsey Mfg. was in a position to do so. We can only assume, in the light of the control of the company by petitioners, that issuance of the preferred stock to petitioners was in the nature of a bonus or profit to them over and above agreed repayment of their interest in such claims, and it is at least conceivable that at the time the preferred stock was placed in petitioners' names, they had in mind its possible use to syphon off part of the profits of the business at a future date without the payment of the tax on ordinary dividends. The form of the transaction obviously lent itself conveniently to that objective.

Regarding petitioners' third contention that it was of advantage to the corporation to terminate future dividend charges that would accrue to the shares of preferred stock which were redeemed, we think that petitioners have not shown any such advantage to be substantial or material. The record does not disclose the total amount of such dividends. Moreover, it does not indicate that these accruals would have in any way impaired the continued or more successful operation of the company, or that their termination would have in any degree improved the credit position of the company.

We think that petitioners have not shown a significant corporate business purpose for redeeming Rumsey Mfg. preferred stock, and, to whatever extent business reasons did in fact motivate the corporation to make this distribution, we do not think that they are sufficient to counterbalance the other strong indicia of a distribution which was essentially equivalent to a taxable dividend.

We hold on the basis of the foregoing that the distribution was essentially equivalent to a dividend. It is unnecessary, therefore, for us to consider the question of basis.

FINDINGS OF FACT.

## *Issue 6.*

On July 17, 1944, Harry P. Barrand, then a stockholder in Rumsey Mfg., offered to sell to Albert Towers, Albert Averbach, David M. Hayman, Theodore C. Bonney, and John Balch, each an officer, director, and stockholder in Rumsey Mfg., all of his stock, both common and preferred, in Rumsey Mfg., certain salaries and commissions claims (in one instance as co-owner with N. R. Williams), and a note of Rumsey Mfg. in the face amount of $2,550, which he held against Rumsey Mfg., for $15,000. The letter making this offer was as follows:

JULY 17, 1944

JOHN BALCH, THEODORE C. BONNEY, ALBERT AVERBACH,
ALBERT TOWERS, and DAVID M. HAYMAN,
c/o *Rumsey Manufacturing Corporation*
*Seneca Falls, New York*
Gentlemen :

I hereby offer to you collectively all the stock appearing in my name upon the books of Rumsey Manufacturing Corporation, consisting of one-sixth of the outstanding common and preferred stock of the said corporation, and being evidenced by certificate numbered #2 for 16⅔ shares of common stock and certificate numbered #4 for 73⅓ shares of preferred stock, together with assignment of release of the following claims.

1. Assignment of a certain 90-day note of Rumsey Manufacturing Corporation dated June 15, 1944, in the amount of $2,550.00 together with any interest due thereon.

2. Assignment of any accruals or sums due me for directors fees for the year 1944 up to and including the date of the payments provided in this agreement.

3. Assignment of any accruals of salaries due or to become due me under a certain employment contract between me and Rumsey Manufacturing Corporation dated April 10, 1943.

4. Assignment of any dividends accruing or due me on my stockholdings up to the date of delivery of said stock.

5. Assignment of all my rights to fees already accruing to me personally, by virtue of the placing of a loan with the Manufacturer's Discount Corporation and/or the Manufacturer's Trading Corporation as expressed and defined in an agreement dated December 30th, 1941 between me and Balch-Morris, Incorporated, by which agreement I was to personally receive 65% of financial fees referred to therein.

It is understood that the fees herein above assigned represent 65% of the total 5% fee computed on the peak amount of money to date by the Manufacturer's Discount Corporation loan and/or the Manufacturer's Trading Corporation, and is that portion of the financial fees which are assured to me personally by the aforesaid agreement dated December 30th, 1941.

In consideration for the delivery of the stock, both common and preferred, herein mentioned, together with the assignments herein specified, the agreed price is to be the sum of $15,000.00 in cash upon delivery of the certificates of stock aforementioned, properly endorsed, and an assignment of the various claims herein specified, said consideration to be paid me on or before August 1,

1944, concurrent with delivery of the stock properly endorsed and the assignments herein specified.

If this letter expresses our entire agreement in connection with this subject matter, please indicate your acceptance of this offer by signature upon the line designated by the word "Accepted", thereby constituting an agreement between us.

H. P. BARRAND

Accepted:
    ALBERT AVERBACH
    ALBERT TOWERS
    THEODORE C. BONNEY
    DAVID H. HAYMAN
    JOHN BALCH

The offer was accepted, and the sale was completed on July 27, 1944. On that same day, Barrand also assigned to this group a note of Rumsey Mfg. in the face amount of $2,500. Each of the purchasers gave their personal checks to Barrand (part of which presumably went to Williams) in the amount of $3,500 (a total of $17,500) for a one-fifth share in the acquisition. At the time of sale Rumsey Mfg. was solvent and all claims were collectible.

The various items were not segregated in the instrument of sale, having all been purchased as part of a "package deal." However, one item (number 5 in Barrand's letter), representing all accruals due for financial fees under a contract with Rumsey Mfg. (held in co-ownership with N. R. Williams), included as part of the transaction, was sold for an agreed price of $5,640.61. The stipulation in this regard is as follows:

On the same day, [July 17, 1944] said Harry P. Barrand executed an agreement in writing with petitioner and four others whereby he undertook to sell for Five Thousand Six Hundred Forty Dollars and Sixty-one Cents ($5,640.61) all accruals due said Barrand for financial fees under a contract with Rumsey Manufacturing Corporation dated December 30, 1941. Both of these agreements were accepted by petitioner and the four others, in writing. * * *

The $2,500 note was obviously sold for face value. At the time of sale, Barrand executed bills of sale and assignments in which he unilaterally provided for separate allocations of the total purchase price, specifically ascribing a consideration of $1 to the claim amounting to $5,640.61.

In 1945, Rumsey Mfg. distributed $10,923.70 to the group of five ($2,184.74 to each) in satisfaction of the Barrand and Williams assigned claims.

OPINION.

*Issue 6.*

Each of the petitioners involved reported some gain on this transaction as net long-term capital gain. The respondent has determined that the full amount received by each petitioner is ordinary income.

Respondent's theory regarding the determination that the amounts received by petitioners from Rumsey Mfg., in satisfaction of the previously assigned Barrand and Williams claims, are taxable in full as ordinary income, seems to be that this distribution was in reality a dividend, or that petitioners' basis for the claims was zero.

We do not think that respondent's first theory is in accord with the facts as stipulated, and we hold that the amounts received in satisfaction of the claims were not dividends.

Preliminary to the determination of the issue of basis, we hold that while the assigned claims were capital assets in the hands of petitioners, the amount received from Rumsey Mfg. was clearly obtained as the result of satisfaction or collection of a claim and not as the result of a "sale or exchange" within the meaning of section 117 (a) (4). Therefore, whatever increment was realized in 1945 by petitioners constitutes ordinary income rather than capital gain. *Pat N. Fahey*, 16 T. C. 105 (1951); *Galvin Hudson*, 20 T. C. 734 (1953). See also *Fairbanks* v. *United States*, 306 U. S. 436 (1939).

Petitioners, however, urge that the basis to them of the various claims was equal in fact to the amount received. In view of the stipulation and the circumstances of the original transaction, we think that petitioners did in fact pay $2,500 for the note in the face amount of $2,500, and $5,640.61 for the Barrand and Williams claim for financial fees. Petitioners, however, have presented no evidence of basis upon which we may fairly allocate the remainder of the lump-sum payment in the "Barrand and Williams purchase" between the amount invested in the other claims which were purchased and the amount paid for the stock holdings which were transferred. To this extent, therefore, we cannot allow petitioners any additional basis, and the remainder of the increment realized must be taxed in full as ordinary income. Cf. *R. C. Coffey*, 1 T. C. 579 (1943).

FINDINGS OF FACT.

*Issue 7.*

In 1927 Albert Towers, in partnership with his brother Samuel Towers, also a petitioner in these proceedings, and their father, Harry Towers, established Bonn's Proprietary General Merchandise & Store. Bonn's business consisted of the operation of a soda fountain and the sale of a great variety of items generally sold in drugstores, except that drugs, prescriptions, and chemicals for which a drugstore license is required were not sold. Petitioner made a substantial investment in the enterprise and spent a great deal of time in conducting its operation from 1927 to 1929.

At some time and under circumstances not clear from the record, Albert Towers endorsed a note for monies borrowed by Bonn's from

Thomas P. Gold. On June 25, 1946, Albert Towers paid Gold $4,000 on a judgment obtained against him as endorser on that note.

In 1931, petitioners Albert and Samuel Towers purchased the Pierre Cosmetics company, a nationally known organization. At that time the company was "fairly well run-down" and petitioners hoped to "build it up again" by supplying whatever monies were needed and by managing it themselves. Despite a national advertising compaign and promotion of the company's products in leading department stores throughout the country, this venture did not ultimately succeed.

In 1931, Albert Towers, as a participant in Pierre Cosmetics, Inc., endorsed a note as guarantor on a lease of offices occupied by the company. In 1946 Towers paid $500 on a judgment obtained against him on that note.

On his 1946 Federal income tax return, petitioner deducted $4,500 as business losses, representing the amounts paid in that year as endorser on the two separate notes. The respondent has disallowed the deduction on the ground that the losses incurred were not ordinary business losses but constituted nonbusiness bad debts.

OPINION.

*Issue 7.*

Respondent has determined that the items here in question are to be treated as nonbusiness bad debts. The burden was upon Albert Towers to present facts, if there were any, upon which we might determine that he was entitled to have the items treated as either business bad debts, business losses, or losses from transactions entered into for profit. The evidence in the case is not sufficient to enable us to find a basis for treatment of either of the items in any of the ways urged on petitioner's behalf. Such affirmative facts as are to be found in the record indicate that a debtor and creditor relationship arose. There is a dearth of facts as to the extent and value of petitioner's rights of contribution or subrogation. In any event, there is no evidence of business loss or loss in a transaction entered into for profit as distinguished from bad debts. Furthermore, we find no evidence supporting the view that Albert Towers was in a trade or business which included as a part of its activities the incurring of the particular obligations now before us or the subsequent payment thereof.

We must accordingly hold for respondent on this issue.

FINDINGS OF FACT.

*Issue 8.*

Following the filing of bankruptcy proceedings against Rumsey Products, and in the fall of 1947, petitioners made an effort to re-

organize Rumsey Products. Petitioners Albert Towers, Bonney, Hayman, and Averbach each advanced funds to cover the cost of the reorganization proceedings. These advances were to cover court costs, travel expenses, attorneys' fees, and "other expenses of similar nature," in the following amounts: Albert Towers, $2,458.58; David Hayman, $2,708.58; Theodore C. Bonney, $2,610.63; Albert Averbach, $2,198.60. A reorganization was never effected and petitioners lost the monies advanced.

OPINION.

## Issue 8.

In his statutory notices of deficiency, respondent disallowed the deductions as to Albert Towers, Hayman, and Averbach, but determined, as to Bonney, that the item be treated as a short-term capital loss. The question of whether the payments made by the other three should be treated the same as that of Bonney need not be considered by us, partly because the three petitioners did not assign error on that ground in their petitions (and do not so claim in their briefs), and partly because, even if we should so determine, our holding would not change the resultant amount of the deficiencies in any of the years before us in view of statutory limitations upon the amount of allowable deductions for short-term capital losses.

All four petitioners maintain that the deductions should be allowed in full for 1947 on the theory that they are either business bad debts or business losses.

In considering the items from the standpoint of business bad debts, we find nothing in the record to support the view that they were debts at all. Rumsey Products was under the jurisdiction of a bankruptcy court, and there is no evidence to the effect that the court authorized the expenditures or took any steps to subject the bankrupt corporation to an obligation to repay. There is likewise no evidence of any express or implied promise on the part of the corporation to repay, assuming that it could have obligated itself while under the court's jurisdiction.

The items cannot be allowed as business losses because there is no evidence that the four petitioners were in any business to which the losses might be attributed.

In the light of the foregoing, we held for respondent on this issue.

FINDINGS OF FACT.

## Issue 9.

The respondent disallowed net operating loss carry-backs from 1947 to 1945 and 1946 for losses from transactions heretofore discussed in Issues 1, 2, and 3, allegedly incurred in a business of organizing,

promoting, managing, and financing business ventures, and in the instance of the motor pool and the lawn mower purchases allegedly incurred in the operation of a trade or business regularly carried on. For applicable facts, see findings of fact set forth in relation to Issues 1, 2, and 3.

OPINION.

### Issue 9.

Section 23 (s) allows a net operating loss as computed under section 122 to be deducted from gross income. Net operating loss is defined as the excess of deductions allowable under chapter 1 of the Code over gross income, subject to the exceptions, additions, and limitations provided for in subsection (d) of section 122. Paragraph (5) of subsection (d) excludes, for the purpose of carry-back and carry-over, deductions otherwise allowed by law which are not attributable to the operation of a trade or business regularly carried on.

Our determinations with respect to Issues 1 and 2 are sufficient to demonstrate that the items there discussed could not be factors in determining a net operating loss for carry-back purposes.

With respect to Issue 3, we held that the losses were incurred in transactions entered into for profit. Since this determination was sufficient for the allowance of the losses in full in the years in which they occurred, it was not necessary in discussing Issue 3 to determine whether they might also be deemed losses incurred in the operation of a trade or business regularly carried on. Such determination is necessary in Issue 9, however, because unless the losses were so incurred, they cannot be treated as factors in the calculation of net loss carry-backs.

As appears under Issue 3, Averbach and Hayman each paid to Rumsey Products the sum of $5,000 for 100 completed lawn mowers. Stripped of unnecessary detail, Albert and Samuel Towers together paid $25,000 for a total of 500 complete lawn mowers.

None of the four petitioners had previously engaged in the business of purchase and sale of lawn mowers.

Except for the fact that Albert and Samuel Towers acted together, the record does not disclose whether or not the petitioners intended to operate as a partnership, as joint adventurers, or as individuals, and, for practical purposes, there is nothing to indicate what plans of operation, if any, had been formulated by them.

The reason for the purchases of lawn mowers appears to have been that there were prospective customers for the mowers who did not have credit ratings satisfactory to an institution which was backing Rumsey Products financially. The four petitioners, however, were willing to take the credit risk and saw an opportunity to sell lawn mowers at

a profit of $5 per mower to the customers who were unsatisfactory as far as Rumsey Products was concerned. The four petitioners, therefore, arranged to purchase the mowers from Rumsey Products at a price which would yield the intended profit on resale.

None of the mowers was ever in fact delivered. Rumsey Products went into bankruptcy between the time of the payment of the total sum of $35,000 and the time for delivery. The only event which actually occurred was the payment of the money. The record does not disclose whether the four petitioners intended to use the facilities of Rumsey Products for storage, or for delivery upon resale, or, in fact, any detailed operating plans or arrangements. There is no evidence that the four petitioners actually secured any orders for lawn mowers or that after the money was paid, any operational steps were taken or business functions performed. There is no evidence that any business was regularly carried on.

Upon the above facts, we conclude that the four petitioners did not reach the point of operating a business or of regularly carrying it on. The deductions which they seek, therefore, while allowable to the extent which we have determined under Issue 3, are not attributable to the operation of a trade or business regularly carried on within the meaning of section 122 (d). We hold, therefore, that net operating loss carry-backs are not available to petitioners.

FINDINGS OF FACT.

*Issue 10.*

At the end of 1946, Rumsey Mfg. owed Theodore C. Bonney $9,202.04 in accrued salary and director's fees. On January 1, 1947, Bonney accepted from Rumsey Mfg. a promissory note (bearing 6 per cent interest) for this amount. The note was subsequently renewed on July 1, 1947, and on that same date the note was sold to David M. Hayman for $5,500. Bonney, a cash basis taxpayer, reported $2,749.50 (one-half of $5,500 less basis of $1) as long-term capital gain in 1947. The respondent determined that the entire $5,500 should have been reported as ordinary (salary) income for 1947.

OPINION.

*Issue 10.*

The sale to Hayman by Bonney, in 1947, of a note issued to Bonney by Rumsey Mfg. for accrued salary and director's fees, raises, with respect to Bonney, the question of whether the amount received is ordinary income or is capital gain.

Petitioner Bonney argues that the note was a capital asset within the meaning of section 117 (a) (1), and since it was held for more than 6 months and then sold, the amount realized is to be treated as long-term capital gain in accordance with section 117 (a) (4).

We think it is well established that income rights attributable to the personal services of an individual cannot be converted from ordinary income into capital gain through the medium of a sale of a note issued in satisfaction of those rights. Cf. *Bessie Lasky*, 22 T. C. 13 (1954); *Helvering v. Smith*, (C. A. 2, 1937) 90 F. 2d 590; *Doyle v. Commissioner*, (C. A. 4, 1939) 102 F. 2d 86. The controlling principle is that any assignment, sale, or other disposition of an accrued right to ordinary income does not alter the character of the amount received, for Federal income tax purposes. See *Charles T. Fisher*, 19 T. C. 384, affd. (C. A. 6, 1954) 209 F. 2d 513, certiorari denied 310 U. S. 627 (1954); *Rhodes' Estate v. Commissioner*, (C. A. 6, 1942) 131 F. 2d 50.

As far as petitioner Bonney is concerned, the cash payment of $5,500 represents the value he received for the services he rendered to Rumsey Mfg., and the entire amount is taxable as ordinary income in the year realized. Cf. *Charles J. Williams*, 5 T. C. 639, 644 (1945).

FINDINGS OF FACT.

*Issue 11.*

Some time during the winter of 1945, Theodore C. Bonney, stockholder, director, and president of Rumsey Mfg., moved to Geneva, New York, and from about January 1, 1946, to July 15, 1947, occupied a house in Geneva owned by Rumsey Mfg. Bonney leased these premises from Rumsey Mfg. for a 5-year term from May 1, 1946, to April 30, 1951, at $75 per month. The lease also provided that Bonney was to have an option to purchase the property for $16,750. If the option were exercised, the rental payments made under the lease were to be applied against the specified purchase price with an appropriate adjustment for interest. The option was never exercised. Bonney did not occupy the premises for the entire period.

Up to the date Bonney ceased to occupy the premises, when Rumsey Mfg. was adjudicated bankrupt in July 1947, no rent had ever been paid to Rumsey Mfg. At that time Bonney owed the corporation 18½ months' rent, or $1,387.50. On the basis of certain advances, consisting of a check dated April 4, 1946, payable to Rumsey Mfg. in the amount of $130, a check dated August 1, 1946, payable to Rumsey Mfg. in the amount of $725, and certain "small amounts of money" advanced "in connection with travel expenses on trips made on behalf of Rumsey Manufacturing Corporation" for which Bonney

was not reimbursed, the trustee in bankruptcy agreed, in 1947, to a setoff of $1,202.44 against the rent which was due and unpaid to date. The difference between the contract rental and setoff, $185.06, has never been paid by Bonney.

The fair rental value of the house leased by Bonney from Rumsey Mfg. was $75 per month.

OPINION.

### Issue 11.

Respondent determined that the fair rental value of the house leased by Bonney from Rumsey Mfg. was $1,200 per year and that Bonney received income during his occupancy in 1946 and 1947 to the extent of such fair rental value.

Bonney, a stockholder, director, and president of Rumsey Mfg., leased the house in 1946 from Rumsey Mfg. at $75 a month for use as a personal residence. He occupied the property for 18½ months during which time he made no rental payments designated as such. However, in 1947, in the course of bankruptcy proceedings against Rumsey Mfg., Bonney and the trustee in bankruptcy agreed to a setoff of $1,202.44 against Bonney's liability to Rumsey Mfg. for rent. The setoff was based upon certain advances previously made by Bonney to Rumsey Mfg. The additional $185.06 liability for rent has never been paid.

The respondent argues, in effect, that petitioner in fact occupied the Rumsey Mfg. property rent free during the 18½-month period, and that in accordance with section 22 (a), which provides that gross income includes "gains or profits and income derived from any source whatever," its fair rental value for that period is taxable as income to petitioner. The respondent does not contend that the fair rental value of the premises represented additional compensation to petitioner paid by Rumsey Mfg. for services rendered as an officer or director of Rumsey Mfg.

Petitioner contends that the setoff arranged in 1947 was actually a payment and settlement of his liability for rent under the lease which called for a fair rental value for the premises. Petitioner argues that at the most, he received additional income in 1947 in the amount of the rental liability not satisfied by the setoff and still unpaid.

The testimony of Bonney, which was uncontradicted, satisfies us that the fair rental value of the property was $75 per month and we so hold. We also hold that Bonney paid the rent to the extent of the setoff allowed by the trustee in bankruptcy. Since petitioner Bonney presents us with no basis for finding error in respondent's determination to the extent of the small difference of $185.06 representing the excess of the total rent at $75 per month over the amount of the setoff,

we hold that to this extent Bonney has failed to overcome the presumption of correctness of respondent's determination. We find, therefore, that Bonney realized income in this respect in the amount of $185.06, which amount is to be spread ratably over the period of his occupancy.

FINDINGS OF FACT.

### Issue 12.

In 1947 Bonney spent $681.96 for repairing damage to the roof of a house which he occupied and which he had leased. The damage was caused by a storm during which some tree branches fell on the roof, puncturing it and causing it to leak. Neither Bonney nor the landlord was required under the lease to make any repairs.

OPINION.

### Issue 12.

It is clear that Bonney, as a tenant, had acquired an interest in the real estate and was entitled to the possession of the leased premises which he occupied. *Coggins* v. *Gregorio*, (C. A. 10) 97 F. 2d 948, 950; *Beall* v. *Everson*, (Mun. Ct. of App., D. C.) 34 A. 2d 41; *Marden* v. *Radford*, (Mo.) 84 S. W. 2d 947, 954; 229 Mo. App. 789; 51 C. J. S. 511, Landlord and Tenant, par. 2b (3). As such, he had a property interest within the meaning of section 23 (e) (3) of the Code.

It is also clear that the property was damaged, and Bonney's interest therein, as tenant, was affected by the casualty. Our difficulty is in finding anything in the record from which we may determine an amount deductible as a loss under the appropriate provisions of the Internal Revenue Code. Assuming that Bonney suffered a casualty loss within the meaning of section 23 (e) (3), section 23 (i) provides that the basis for determining the amount of the deduction shall be the adjusted basis provided in section 113 (b) for determining the loss from a sale. There is, however, nothing in the record from which we can either determine what that basis was or whether the loss exceeded such basis. See *United States* v. *Koshland*, (C. A. 9) 208 F. 2d 636 (especially note 3, p. 639).

The proof of out-of-pocket expenditures for repairing the damage caused by the casualty presents an appealing argument for the allowance of a deduction to the extent of the actual amount of such expenditures. If permitted by the statute, it would here present a simple solution, although we can envisage difficult problems which would follow in its wake under more complex circumstances. We think it is clear, however, that the expenditures for repairs, although resulting from the casualty, do not of themselves represent or measure the

storm loss of property for which provision is made by section 23 (e) (3).

We add that, since the damage was to a private dwelling not connected with a trade or business, we know of no other provision of the Code under which the actual expenditures might be allowable as deductions.

FINDINGS OF FACT.

*Issue 13.*

Petitioner Theodore C. Bonney first met Edna Wheaton Stark in the fall of 1936. Bonney was on his way to Oneida Lake, in upstate New York, to do some duck hunting, when he stopped at the Old Dutch Tavern, on the east side of the lake, for dinner. That evening, a party of several people, including Edna, her mother and father, and an uncle, Eugene Hickock, a prominent lawyer, were also dining at the Tavern. Mr. Bergduff, the owner of the restaurant and an old friend and client of Bonney, said that he would like Bonney to meet some people, and proceeded to introduce Edna and her party. Bonney was immediately attracted to her, and about 8 months after their first meeting they became engaged. Bonney and Edna were subsequently married in Syracuse, New York, on August 19, 1937, by Bonney's father, a judge at that time. From that date until April 1945, Bonney and Edna lived together as man and wife.

Edna formerly had been married on June 6, 1921, and was subsequently divorced in the State of New York in March 1922. The decree of divorce had been granted on the grounds of adultery on her part, and she was prohibited from remarrying in the State of New York without a special decree from the Supreme Court of the State of New York during the lifetime of her husband. On the date of the ceremonial marriage of Bonney and Edna, the decree of divorce was in force without modification, the husband was still alive, and no order had been issued by the Supreme Court of the State of New York to permit Edna to remarry.

At the time of his marriage to Edna, Bonney was not aware that she had been married previously or that she had been divorced and prohibited from remarrying. For reasons not apparent on the record, Bonney became suspicious in April 1945, and as a result caused an investigation to be made. After he ascertained the facts, some time in the early part of May 1945, Bonney separated from Edna and commenced an action in the New York Supreme Court on October 25, 1945, for a declaratory judgment to declare his marriage a nullity. A trial was held at which Edna was present and represented by counsel, and Bonney was granted an interlocutory judgment on April 7, 1947, declaring that the ceremonial marriage of August 19, 1937, was void

*ab initio*, in accordance with section 6 of the Domestic Relations Law of New York which provides that a marriage under circumstances such as those of the instant case is bigamous.

Bonney claimed a deduction in his 1945 Federal income tax return for $3,908.50 as monies obtained by Edna by fraud, deceit, false pretenses, and theft. In that same year he also deducted the following amounts obtained from him in previous years in the same manner:

| | | | |
|---|---|---|---|
| 1937 | $225. 80 | 1941 | $1, 785. 01 |
| 1938 | 1, 187. 69 | 1942 | 3, 333. 34 |
| 1939 | 621. 58 | 1943 | 7, 171. 29 |
| 1940 | 1, 402. 17 | 1944 | 4, 268. 70 |

All of these monies represent payments made to Edna for her clothing and spending money during the period that Bonney and she lived together as man and wife.

OPINION.

*Issue 13.*

The respondent disallowed the deductions in question on the ground that they do not qualify as proper deductions under either section 23 (e) or (u) of the Code.

We think it is obvious that section 23 (u) of the Code, dealing with alimony payments in the case of a divorce or decree of separate maintenance, has no application, and that petitioner's only serious contention is that these payments were made under such circumstances as to constitute a loss by theft under New York law, giving rise to a deduction under section 23 (e) of the Internal Revenue Code.

Petitioner's theory is that these monies were obtained from him by fraud amounting to theft. Petitioner argues that Edna, knowing of her legal inability to marry petitioner in 1937, intentionally did not disclose this fact and thus by false pretense induced petitioner to go through a ceremonial marriage with herself for the purpose of obtaining monies from the petitioner. Petitioner contends that Edna's acts in obtaining such monies constituted larceny by false pretenses within the meaning of section 1290 of the New York Penal Code, and that as a result, petitioner suffered a loss by theft within the meaning of section 23 (e) of the Code, deductible in full in the year in which the theft was discovered.

The question of whether or not the circumstances amount to theft depends upon the law of the State of New York. *Curtis H. Muncie*, 18 T. C. 849 (1952); *Morris Plan Co. of St. Joseph*, 42 B. T. A. 1190 (1940).

Section 1290 of the New York Penal Code defines larceny in the following language:

A person who, with the intent to deprive or defraud another of the use and benefit of property or to appropriate the same to the use of the taker, or of any other person other than the true owner, wrongfully takes, obtains or withholds, by any means whatever, from the possession of the true owner or of any other person any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind, steals such property and is guilty of larceny.

Hereafter it shall be immaterial in, and no defense to, a prosecution for larceny that: 1. The accused obtained possession of, or title to, such property with the consent of the person from whom he obtained it, provided he induced such consent by a false or fraudulent representation, pretense, token or writing; or

2. The accused in the first instance obtained possession of, or title to, such property lawfully, provided he subsequently wrongfully withheld or appropriated such property to his own use or the use of any person not entitled to the use and benefit of such property; or

3. The person from whom the accused obtained such property intended to part with title to, as well as possession of, such property, or with possession as well as title; or

4. The purpose for which the owner was induced to part with possession of such property was immoral or unworthy.

We have no doubt that the word "theft," as used in section 23 (e) (3) of the Internal Revenue Code, includes larceny. We must decide, therefore, whether petitioner has established that he was in fact the victim of larceny by false pretense within the meaning of the New York statute.

In *People* v. *Lehrer*, 45 N. Y. S. 2d 170 (1943), the court set forth the elements which must be established to constitute the crime of larceny by false pretenses within the meaning of New York law as follows:

To constitute the crime of grand larceny by false pretenses, five elements must be established: (1) that there was a criminal intent to deprive and defraud the owner of her property (2) that the defendant made a false representation of a past or existing fact (3) that he knew that the representation was false (4) that he obtained the property and (5) that the person to whom the representation was made relied upon that representation and was in whole or in part influenced thereby to give * * * property to the defendant; in other words, that the representation in whole or in part was the inducing cause of the complainant parting with * * * money. [p. 172]

Our review of the record does not convince us that petitioner has established these elements. While Edna no doubt looked to Bonney for support when she participated in the marriage ceremony, there is no evidence that she went through the form of marriage with the intent and purpose of obtaining from Bonney the monies in question which he turned over to her during the years 1937 to 1945, inclusive. The parties did in fact live together as man and wife during that period and, while Bonney did not know that the marriage was illegal, the money was willingly turned over to Edna without, so far as the

record goes, any importuning on her part. Even if the marriage had been legal and binding, she would have had no assurance that she would have received anything other than necessary support except by voluntary act on the part of Bonney. We do not doubt that if Bonney had known that Edna was not free to marry, he would not have gone through the form of marrying her, in which event the issue confronting us would not have presented itself. The concealment of the material condition against remarriage in her divorce decree and her purported marriage to Bonney were reprehensible acts on her part. We think, however, that there is a broad gap, which has not been bridged in the record, between those acts and the acceptance of the various amounts of money which Bonney gave her while they were living together. Upon consideration of all of the circumstances, we do not think that her acceptance of such monies constituted theft within the meaning of the New York statute.

### FINDINGS OF FACT.

## *Issue 14.*

In connection with the annulment proceeding referred to in Issue 13, Edna made application for temporary alimony and counsel fees, which is permitted under New York law when the defendant is a woman. In support of her application, she filed affidavits in the proceeding containing derogatory accusations against Bonney. These included assertions that Bonney had beaten her; that he knew at the time of their marriage ceremony about her prior marriage and of her divorce; that he (Bonney) had advised her as a lawyer that she was free to marry in New York State; that he ran a divorce mill; and that he had admitted to her that he had trumped up evidence in a divorce case. She also charged that Bonney had been guilty of malpractice as a lawyer, that he was a liar and a perjurer, and that he had "double crossed" his clients and "sold them out." There was some notoriety in connection with these accusations and the charges were repeated in several newspapers published in Syracuse, Seneca Falls, and Norwich. In addition, Edna publicized these charges against Bonney by relating them to mutual friends and to various of Bonney's clients. Norwich and Seneca Falls being small communities, accusations made by Edna were widely circulated among the persons with whom Bonney had professional and business dealings.

Edna, in conjunction with her accusations, demanded that Bonney pay her a substantial sum of money and transfer certain property to her. She threatened to have disbarment proceedings instituted against Bonney if he did not satisfy her demands for such money and property.

As a result of these charges and the circulation of derogatory remarks and stories about Bonney, his professional reputation and personal character were seriously impugned, affecting adversely his standing in the community. A number of persons believed the charges, and, as a consequence, withdrew their business from Bonney. Others did not seek him out for professional services as they might otherwise have done. In 1949, the Martindale-Hubbell Legal Directory lowered its rating of Bonney in its directory for 1949 in the light of the charges made against him concerning his law practice.

Some of those of Bonney's friends who did not believe the charges advised him that it would be well for him to do something about "quieting" Edna. At one point, Albert Towers, as general manager of Rumsey Mfg., called Bonney to his office and advised Bonney that if matters were not straightened out between him and Edna, it might be necessary for Bonney to resign from the presidency of Rumsey Mfg. Edna had made the statement to Albert Towers that she was going to come to Seneca Falls to inform Bonney's business associates and other persons with whom he did business for Rumsey that Bonney was a "crook" and was "unscrupulous." Towers told Bonney that the company was having enough difficulty without the addition of the unfavorable publicity surrounding Bonney's marital difficulty; that continued strife between Bonney and Edna was very bad for the company; and that perhaps someone else could be more helpful to the company as president than Bonney.

Bonney came to the conclusion that it was to his best interests in preserving his reputation as a lawyer and maintaining his standing with Rumsey Mfg. and Rumsey Products that he do something to get Edna to stop the campaign she was waging. To accomplish this, Bonney, on April 7, 1947, paid her $12,250 in cash and deeded to her his interest in a farm which had cost him $13,000 and which he had caused, during the period they had been living together as man and wife, to be placed in his name and hers as tenants by the entireties. He was afraid that if he did not do so, she would continue to do and say things harmful to him and to his reputation.

OPINION.

*Issue 14.*

Bonney claimed a deduction in the aggregate amount of $24,054 in his 1947 return, the above amount representing $12,250 paid to Edna in cash and $13,000 attributed to the transfer of his interest in the farm. Petitioner argues that these items constituted a theft loss on the theory that they were obtained under duress in circumstances which amounted to extortion; and second, in the alternative, that the

cash and property were paid and transferred to Edna in order to protect petitioner's professional and business reputation and standing, and thus properly constituted ordinary and necessary business expenses.

The New York Penal Code, section 850, defines extortion as "the obtaining of property from another * * * with his consent, induced by a wrongful use of force or fear * * *." Section 851 provides further that:

Fear, such as will constitute extortion, may be induced by an oral or written threat: 1. To do an unlawful injury to the person or property of the individual threatened, or to any relative of his or to any member of his family or to a corporation of which he shall be an officer, stockholder, employee or agent; or,

2. To accuse him, or any relative of his or any member of his family, of any crime; or,

3. To expose, or impute to him, or any of them, any deformity or disgrace; or,

4. To expose any secret affecting him or any of them; or,

5. To kidnap him or any relative of his or member of his family; or,

6. To injure his person or property or that of any relative of his or member of his family by the use of weapons or explosives. As amended L. 1911, cc. 121, 602; L. 1917, c. 518, eff. Sept. 1, 1917.

Section 857 provides as follows:

*Attempts to extort money or property by oral threats.*

A person who, under circumstances not amounting to robbery, or an attempt at robbery, with intent to extort or gain any money or other property, orally makes such a threat as would be criminal under any of the foregoing sections of this article or of section five hundred and fifty-one, if made or communicated in writing, is guilty of a misdemeanor. The provisions of this section do not apply to matters governed by section eight hundred and fifty-one of this act. As amended L. 1911, c. 121, eff. Sept. 1, 1911.

In the course of the proceedings in the instant case, Albert Towers, Bonney, and a friend of Bonney's (Mr. Mix) all testified that Edna threatened to continue to circulate her stories about Bonney until he "would give her plenty." Bonney stated:

She sent word to me that she wanted a large amount of money and a deed to the farm and that she was going to keep up this course of conduct until I gave up to her. * * *

Some of them [friends of Bonney] conveyed messages to me that had been given by her to the effect that if I didn't pay she was going to institute disbarment proceedings against me. * * *

Assuming *arguendo* that the conduct of Edna resulting in the payment of a substantial sum of money and the transfer of property to her by Bonney amounted to extortion, we find nothing in the provisions of the New York Penal Code (secs. 850, 851, and 857) which would justify a construction to the effect that the crime of extortion, committed in the manner described in the evidence in this case, was tantamount to or included within the accepted meaning of the word "theft."

It is obvious that the circumstances do not amount to robbery. Petitioner refers us to no authority which characterizes extortion, upon analogous facts, as theft under the New York law, or defines the word "theft" as applicable to the facts before us. We hold that the procurement of the money and property by Edna did not amount to theft within the meaning of section 23 (e).

Petitioner contends in the alternative that the money and property he conveyed to Edna constituted an ordinary and necessary business expense. Petitioner argues that it was necessary for him to incur this expense in order to protect his law practice and his position as a corporate executive from irreparable damage, and that in the particular circumstances of this case it was quite ordinary to incur such an expense.

In considering this argument, we point out that we do not have before us the problem of the deductibility of expenditures paid in the defense of business reputation. We are here dealing with payments asserted to have been made to an extortioner demanding and accepting them without color of right. We know of no authority which warrants such an allowance, and we do not think it possible that Congress intended to permit a deduction as an ordinary and necessary expense of business under the circumstances confronting us. It is our view that such an allowance would be contrary to public policy.

*Lindsay C. Howard*, 16 T. C. 157 (1951), is clearly distinguishable from the instant case. Petitioner there incurred expenses for legal fees in defending himself in a court martial proceeding which might have led to dismissal from his position as an Army officer. While the origin of the charge against Howard was a dispute with his ex-wife over alimony, the ultimate circumstances requiring the expenditure which was allowed arose out of his trade or business. Moreover, the payments were not made as hush money.

Likewise, *Catholic News Publishing Co.*, 10 T. C. 73 (1948), is distinguishable from the instant case. There petitioner's president had earlier served as the treasurer of the Catholic Press Association. A controversy arose, based on a claim of the association that petitioner's president had failed to properly invest certain Association funds, causing the association to lose interest which would otherwise have accrued to it. Petitioner's president denied that he was guilty of any misconduct. The dispute, however, was having an adverse effect on petitioner's business. In order to protect its business, petitioner ordered its president to pay the sum claimed and subsequently reimbursed him for the amount paid. We allowed petitioner to deduct that amount as an ordinary and necessary business expense. Unlike the instant case, there was an actual controversy, and the settlement was of a disputed issue.

*Huff, Andrews & Thomas*, 1 B. T. A. 542 (1925) ; *Louisiana Jockey Club, Inc.*, 13 B. T. A. 752 (1928) ; and *Sands Springs Railway Co.*, 21 B. T. A. 1291, cited by petitioner, also involve situations significantly different from the one presented here. In each of those cases the expenditure which was allowed was made to avoid the likelihood of termination of the respective licenses under which the petitioners operated by an agency or organization which had the power to withdraw such license. It is clear upon examination of the opinions in the three cases that none of the elements of the instant case were involved.

For completeness, we add that there is no evidence in the case of the value, in 1947, of Bonney's remaining interest in the farm which he caused to be transferred to Edna in that year.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

KERN and HARRON, *JJ.*, dissent on Issue 5.
ARUNDELL, *J.*, dissents on Issues 4 and 5.

---

MURDOCK, *J.*, dissenting : I disagree with the result and reasoning on a number of issues including those mentioned below. The evidence seems sufficient to justify allowance of the bad debts as business bad debts. It is held that the 1945 distributions by Rumsey Mfg. of the "Donated Surplus Account" represented repayment of loans and, since that decided the only issue stated, it is error to go further and decide a point not raised in connection with those repayments. The retirement of the preferred stock of Rumsey Mfg. in 1945 was not shown to be within section 115 (g). I think "the remainder of the lump-sum payment" in the "Barrand and Williams purchase" should be allocated. *Cohan* v. *Commissioner*, 39 F. 2d 540.