Augustus F. Lasker and Henrietta K. Lasker v. Commissioner.
Lasker v. Commissioner
Docket No. 48640.
United States Tax Court
T.C. Memo 1956-242; 1956 Tax Ct. Memo LEXIS 53; 15 T.C.M. (CCH) 1243; T.C.M. (RIA) 56242; October 31, 1956
E. Charles Eichenbaum, Esq., Boyle Building, Little Rock, Ark., and Leonard L. Scott, Esq., for the petitioners. J. W. Alexander, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against petitioners for the year 1948 in the amount of $12,496.68. The questions for decision are (1) whether a debt owing to petitioner Augustus F. Lasker by a corporation of which he was a stockholder, which debt became worthless in the year 1948, was a bad debt within the meaning of section 23(k)(1) and deductible thereunder, or a non-business debt subject, for deduction purposes, to the limitations of section 23(k)(4) of the Internal Revenue Code of 1939, and (2) whether petitioner Augustus F. Lasker suffered a loss in the year 1948 *54 by virtue of his payment of a note of the said corporation on which he was endorser. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife and reside in Little Rock, Arkansas. For 1948 they filed a joint income tax return with the collector of internal revenue for the district of Arkansas. Augustus F. Lasker, sometimes referred to as petitioner, was born April 2, 1917. His father died in April 1923, leaving an estate in excess of $200,000. One-half of the estate was left to petitioner's mother and the remaining one-half to petitioner, which half was to be distributed to him at the age of 25. Petitioner's mother died prior to his twenty-fifth birthday and under the terms of her will he was to receive one-half of her estate at the age of 25 and the remaining half at the age of 35. Petitioner attended the University of Michigan for two years and Knox College in Illinois for two years, receiving from the latter a Bachelor of Arts degree. Petitioner's first employment after graduation was that of real estate salesman extending through 1941 and part of 1942. In August of 1942 petitioner, or his wife with money supplied *55 by petitioner, purchased the Standard Automatic Music Machine Company, hereinafter referred to as Standard, for which he paid $9,000 cash and assumed liability for a loan in the amount of $16,000. Standard was operated as a sole proprietorship and its business was that of operating, leasing and distributing "automatic and coin-operated machines and devices of that nature." [1] Petitioner was inducted into the Army in October 1942, and was discharged in October of 1945, and during the period of his Army service Standard was operated by Henrietta and a manager. As a part of Standard's operations financial aid, in the form of loans, was supplied from time to time to enterprises, going or potential, the places of business of which would provide desirable locations for the various coin-operated machines and devices. The dominant purpose of making such loans was not the earning of interest but the promotion of the coin machine business. A two-thirds interest in Standard and its business was sold in 1946 for $51,017.50, *56 resulting in the realization of capital gain in the amount of $39,003.58. Also in 1946, petitioner joined in the forming of a corporation known as Ark-Tenn Distributing Company, sometimes referred to as Ark-Tenn. Upon organization, Ark-Tenn engaged in the wholesale distribution of machines of the same type as those dealt in by Standard at the retail level. Petitioner supplied $25,000 of Ark-Tenn's capital, for which preferred stock in that amount was issued to Henrietta. Petitioner made some selling trips for Ark-Tenn, helped to negotiate some contracts for buyers of the machines and participated generally in the management of the company. Concluding that his connection with Ark-Tenn was interfering with his activities in the operation of Standard, petitioner, on July 14, 1946, sold the $25,000 of Ark-Tenn preferred stock to his associates in that company for $28,000. The expense of the sale was $500 and the profit was $2,500. The gain on the sale of the interest in Standard and on the sale of the preferred stock of Ark-Tenn was reported as capital gain by Henrietta in her individual income tax return for 1946. She also reported the income from the operation of Standard as her *57 income as she had done for prior years. In reporting the income from Standard for 1946 she claimed a deduction of $803.50 as bad debts, which debts had resulted from loans made, as above stated, in the procuring of locations for machines. In 1948 the respondent determined that the income from Standard's operations for 1944, 1945 and 1946 and the gain from the sale of the interest therein in 1946 were the income and gain of petitioner, and not Henrietta, and petitioner acquiesced in that determination. Similarly, he determined that the gain from the sale of the Ark-Tenn stock was that of petitioner, and petitioner also acquiesced in that determination. For 1944, however, petitioner was allowed a deduction to the extent of Standard's net income for the year as salary to Henrietta, the entire amount being only $994.90. For each of the years 1945 and 1946 and as salary to Henrietta, respondent allowed a deduction of $1,500. The bad debt deduction of $803.50 was allowed to petitioner as had been claimed by Henrietta on her return. On or about April 1, 1948, a corporation named L & M, Inc., was organized under the laws of Arkansas. The capital stock was represented by $25,000 in preferred *58 stock, all of which was paid in and owned by petitioner, and 300 shares of no par common stock. The common stock was owned one-half by petitioner, one share being issued to Henrietta, and one-half by Henry A. McCune. No money was paid in for the common stock which had a stated value of $1. McCune was president of the corporation and petitioner was its secretary. The principal business for which L & M was organized was to build boats for Sears, Roebuck and Co. It was the understanding of L & M, however, that Sears would provide it with additional work to enable it to keep its factory force together when not building boats. For use in its operations, L & M, on May 8, 1946, borrowed $40,000 from the Peoples National Bank of Little Rock, which bank later became the First National Bank. The loan was evidenced by a note secured by warehouse receipts on materials purchased by L & M for use in building the boats. In addition to the warehouse receipts, the bank required petitioner's personal endorsement on the note. The procedure thereafter was that the bank would receive a copy of each shipping invoice for the boats which were finished and sold. Sears, the purchaser, would pay the bank *59 directly and the bank would apply the payments on the L & M note, releasing warehouse receipts to the extent of the money received. By December 14, 1948, the amount owing on the note had been reduced to $7,256.35. The customer reception of the boats did not meet expectations and Sears did not supply the additional business which had been anticipated. The result was that L & M soon experienced financial difficulties. It stopped building boats in July 1948, and began making baby play pens and porch gates. Between August 19 and October 29, 1948, petitioner made a series of five advances of cash to L & M, amounting in all to $23,844.44. The advances were evidenced by demand notes of L & M. The financial condition of the corporation worsened rather than improved and on December 9, 1948, a special meeting of its board of directors was held. The minutes of the meeting show the following: "A special meeting of the Board of Directors of L & M, Inc. was held at the offices of the company on the 9th day of December, 1948, at 10:00 A.M., notice of time and purpose of said meeting having been waived by all Directors. "Present were: Gus Lasker H. A. McCune "Absent was: Henrietta *60 Lasker "Discussion was had of the financial condition of the business. Mr. Lasker pointed out that the business was steadily losing money and that he was unwilling to individually lend any more money to the corporation and he did not see any point in continuing operation. "Discussion was had to the effect that there would not be enough assets to pay all debts in full, whether liquidation be effected by voluntary petition in bankruptcy or by dissolution and orderly liquidation, but that much less would be realized in the event of liquidation through bankruptcy; that it would be beneficial to the corporation and to creditors, of which Mr. Lasker was one, to elect to pursue an orderly liquidation without bankruptcy. Mr. Lasker advised that he did not want to see the corporation file a petition in bankruptcy, and that he was willing to defer the debts owed him by the corporation to payment of all other creditors, and was further willing to advance necessary funds to pay off all such creditors, and to pay employee expenses and expenses of operation during liquidation, provided that the proceeds of liquidation should be first applied to the funds so advanced by him for such purposes *61 of liquidation, the excess, if any, to be applied to his debts, or that the assets prior to reduction to cash be transferred to him, at his election. "On motion made and seconded, it was unanimously resolved that the corporation be dissolved and further that a meeting of stockholders be called immediately to take action upon the resolution to dissolve. "On motion made and seconded, and unanimously carried, it was resolved that the corporation accept the proposal of Mr. Lasker, and it was further resolved that, subject to approval by the stockholders, the liquidation proceed as expeditiously as possible. "There being no further business the meeting adjourned." Immediately following the special meeting of the board of directors, a meeting of the stockholders was held. The minutes of the said meeting are as follows: "A special meeting of the stockholders of L & M, Inc. was held at the office of the company at 11:00 A.M. on December 9, 1948, immediately following special Directors meeting, all stockholders being present in person or by proxy, H. A. McCune and Gus Lasker being present in person and Henrietta Lasker being present by proxy. "Discussion was had of the resolution *62 of the Board of Directors to dissolve the corporation. "On motion, ade, seconded, and unanimously carried, it was resolved that the corporation surrender its charter to the State of Arkansas and that it cease to be and exist as a corporation. "It was further unanimously resolved that the offer of Mr. Gus Lasker to finance the necessary cash funds to accomplish liquidation, in order to pay off all other creditors besides himself, and in order to pay the expenses of liquidation, provided that his advances be first repaid from the proceeds of liquidation, the excess, if any, being applied to the debts owed him, or provided the assets be transferred to him at his election, be accepted. "It was further resolved that the President and Secretary have Counsel prepare necessary papers certifying as to the disolution of the corporation, and that liquidation be proceeded with as expeditiously as possible. "There being no further business the meeting adjourned." On December 14, 1948, petitioner paid the $7,256.35 still owing to the First National Bank on the $40,000 note on which he was endorser and received and took over the warehouse receipts securing the payment of that indebtedness. *63 No books or records have been retained specifically showing the inventory covered by the warehouse receipts received by petitioner from the bank, but according to the December 31, 1948 balance sheet of L & M appearing in its income tax return for the period beginning April 1, 1948, and ending December 31, 1948, there was a total inventory of $15,878.65, consisting of $14,442.30 representing raw materials and $1,436.35 covering finished goods. According to the L & M ledger sheet "Notes Payable To: Gus Lasker," $871.80 was received and applied on December 20, 1948, and $619.39 on January 26, 1949, to the $7,256.35 petitioner had paid the First National Bank in satisfaction of the L & M note. In addition and under date of January 26, 1949, $1,000 was shown as having been paid on the advances of $23,844.44 petitioner had made to L & M. In 1948 petitioner invested "about $1750" in an oil lease, and during 1949 and 1950, in conjunction with a cousin and others, he formed the Travis Oil Corporation, of El Dorado, Arkansas. Petitioner and his cousin invested "approximately $15,000" in the venture. The extent of petitioner's activities relating to the operations of the Travis Oil Corporation *64 was the visiting of the site of drilling operations. In his income tax returns for 1945, petitioner adjusted gross income in the amount of $31,725.53, of which $28,152.38 was reported as net rents on real estate inherited from his parents; $2,499.96 as income received from the estate of Minnie E. Lasker; $500 as salary from Standard, and $573.19 as dividends and interest. For the year 1946 petitioner reported adjusted gross income of $39,186.05, consisting of $29,451.36 as net rents from inherited real estate; $5,863.26 as capital gain from the sale of inherited real estate; $2,499.96 as income from the estate of Minnie E. Lasker; $600 as salary from Standard, and $771.47 as interest. On his return for 1947, petitioner reported adjusted gross income of $72,805.46, of which $43,256.64 was reported as net rents on inherited real estate; $1,008.25 as capital gains, substantially all from sale of assets from the Minnie E. Lasker estate; $24,779.34 as income from the Minnie E. Lasker estate; $2,074.58 as dividends from stock, and $1,686.65 as interest. The amount reported as interest was shown as interest on "Real Estate Notes" - $506.65 and "Interest on U.S. Bonds" - $1,180. For *65 the year 1948 petitioner and Henrietta reported $66,867.54 as net rents from inherited real estate; $2,914.46 as dividends and $2,468.66 as interest. The $2,468.66 reported as interest was shown as interest on "Real Estate Note" - $247.24, "Interest on Note (Income of Henrietta K. Lasker)" - $1,050, and "Interest on U.S. Bonds" - $1,171.42. A deduction of $23,844.44, representing the loss on the cash advances made by petitioner to L. & M, was claimed as a business loss. The indebtedness of $23,844.44 owing by L & M to petitioner was not a debt the loss from which was incurred in a trade or business of petitioner. Opinion The respondent does not dispute the claim that L & M's indebtedness of $23,844.44 to petitioner became worthless in 1948, and the only question is whether it was a debt within the meaning of section 23(k)(1) of the Internal Revenue Code of 1939, [2] or a non-business debt within the meaning of section 23(k)(4). [2]
*66 According to section 23(k)(4), a debt is not a non-business debt if the loss from its worthlessness is a loss "incurred in the taxpayer's trade or business." Relying in particular on Henry E. Sage, 15 T.C. 299, it is the contention of the petitioner that the debt in question was a debt, the loss from the worthlessness of which was incurred in his trade or business and the deduction of which is governed by section 23(k)(1). On its facts this case, in our opinion, is not the Sage case, and the loss in question was not a loss incurred in a trade or business carried on by petitioner. In short, there is an absence of a proximate relation of the debt to any trade or business of the petitioner. From the record it would appear that petitioner's interests, business or financial, at least up through the taxable year herein, were centered in the main in the real estate holdings inherited from his parents and that it was in such holdings that the bulk of his fortune was invested. Certain it is that it was from rents that by far the greater portion of his income was derived. Actually for the period shown he made few side investments and only with respect to the brief period during *67 which he was employed as a real estate salesman and with respect to the conduct of the business carried on under the name of Standard Automatic Music Company does there appear to be any substantial basis of record for saying that he was carrying on a trade or business. It is possible that he did devote some considerable time and attention to the affairs of L & M in 1948, and had previously spent some time in the conduct of the business of Ark-Tenn in 1946. But the businesses there being carried on were the businesses of the corporations in which he had invested some of his capital and of which he was an officer. And certainly as to the two oil ventures, if there were two rather than one, there is not even any color of record for a claim that he was other than a passive investor. As for the loaning of money to such enterprises, the loans to L & M stand alone. It is of course true that various small loans were made in carrying on Standard's business, but the loans to L & M were in no way related to the conduct of that business or comparable to the loans made therein. And on the record here, there might even be some question as to whether the business of Standard was that of petitioner *68 or of Henrietta, it being petitioner's stated conclusion as a witness that the business was that of Henrietta. It could have been also that petitioner's activities in renting and maintaining his real estate holdings were such as to constitute the carrying on of a trade or business but we have no claim or proof to that effect and there again there would have been no proximate relation to L & M or the making of the loans to it. The facts of record being as they are, we conclude and hold that the loss from the worthlessness of the debt of $23,844.44 owing by L & M to petitioner was not a loss from the worthlessness of a debt incurred in the taxpayer's trade or business and that the debt was a non-business debt within the meaning of section 23(k)(4) and deductible thereunder. See and compare Samuel Towers, 24 T.C. 199, 212; Hadwen C. Fuller, 21 T.C. 407, 412; Charles G. Berwind, 20 T.C. 808, 815, affd., 211 Fed. (2d) 575; Jan G. J. Boissevain, 17 T.C. 325; and, A. Kingsley Ferguson, 16 T.C. 1248. With respect to the payment made to the First National Bank in final satisfaction of the note of L & M on which *69 he was endorser, petitioner, by amendment to his petition, claimed deduction of $5,765.16, namely, $7,256.35, the amount paid to the bank, less the payments of $871.80 and $619.39 recorded in L & M's books under dates of December 20, 1948, and January 26, 1949. On brief, his claim now is that his deductible loss thereon was at least $4,000. Frankly, we do not know what the outcome of the payment of L & M's note to the First National Bank was in so far as petitioner is concerned and from petitioner's own testimony we are not certain that he knows. We do know that upon payment of the balance owing on the note he received the warehouse receipts which had been placed with the bank as collateral, and that according to the balance sheet of L & M at December 31, 1948, its inventory of raw materials and finished goods had a book value of $15,878.65. And, there is no contention that petitioner did not have first claim on any and all amounts which might thereafter be realized on the materials covered by those receipts. McCune was called to testify as to the fair market value of the materials covered by the warehouse receipts at the time they were acquired by petitioner, but it was clear that *70 he was not certain as to the materials covered and on hand and his observations as to value were too vague to justify a finding that the value was less than petitioner had in them. Whatever the ultimate outcome may have been, the proof does not establish a loss in 1948. For failure of proof, the claim of deduction is denied. Decision will be entered for the respondent. Footnotes
1. Although the record is not specific on the point, the indication is that the machines consisted in the main of music machines or "juke boxes" and "marble tables."↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩